The **LETTER EDGED IN BLACK PRESS, INC.**, an Illinois corporation, Plaintiff,

v.

**PUBLIC BUILDING COMMISSION OF CHICAGO**, a municipal corporation, Defendant.

No. 69 C 353.

United States District Court, N. D. Illinois, E. D.

Dec. 22, 1970.

Arvey, Hodes & Mantynband, Barnet Hodes, J. Herzl Segal and Jack H. Oppenheim, Chicago, Ill., for plaintiff.

Thomas R. Juettner, Gary, Parker, Juettner, Pigott & Cullinan, William R. Dillon, Concannon, Dillon, Snook & Morton, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

NAPOLI, District Judge.

Plaintiff seeks a declaratory judgment invalidating defendant's copyright to the Pablo Picasso sculpture entitled "The Chicago Picasso." The defendant is the Public Building Commission of Chicago (Commission) and the plaintiff is a publisher who desires to market a copy of the sculpture. Pursuant to Rule 56 of the Federal Rules of Civil Procedure both parties have moved for summary judgment. Succinctly, plaintiff maintains that defendant's copyright is invalid because the sculpture is in the public domain. Defendant asserts that the Chicago Picasso has never been in the public domain.

## STATEMENT OF FACTS

In 1963 certain of the Civic Center architects, representing the Commission, approached Picasso with a request to design a monumental sculpture for the plaza in front of the proposed Chicago Civic Center. By May, 1965, Picasso completed the maquette (model) of the sculpture. William E. Hartmann, the architect, who had been the chief liaison with Picasso, then had the maquette brought to the basement of the Art Institute of Chicago, without public notice. The design of the maquette was subjected to an engineering analysis to determine the feasibility of constructing the monumental sculpture and three Chicago charitable foundations undertook to finance the actual construction by contributing $300,000 toward the total cost of $351,959.17. An aluminum model of the design with some slight revisions was prepared as a guide to the construction of the sculpture, and Picasso approved a picture of this model on August 9, 1966.

The Commission, through its board, had been given a private viewing of the maquette. Subsequently, the Commission passed a resolution authorizing the payment of $100,000 to Picasso. This sum was intended as the purchase price for the entire right, title and interest in and to the maquette constituting Picasso's design for the monumental sculpture including the copyright, and copyright renewals. Hartmann proffered the $100,000 check to Picasso and asked the artist to sign a document referred to as the "Formal Acknowledgment and Receipt." Picasso refused to accept the money or to sign the document. He stated that he wanted to make a gift of his work. In accordance with Picasso's wish, counsel for the Commission and William Hartmann prepared the following "Deed of Gift" which Picasso signed on August 21, 1966:

> The monumental sculpture portrayed by the maquette pictured above has been expressly created by me, Pablo Picasso, for installation on the plaza of the Civic Center in the City of Chicago, State of Illinois, United States of America. This sculpture was undertaken by me for the Public Building Commission of Chicago at the request of William E. Hartmann, acting on behalf of the Chicago Civic Center

architects. I hereby give this work and the right to reproduce it to the Public Building Commission, and I give the maquette to the Art Institute of Chicago, desiring that these gifts shall, through them, belong to the people of Chicago.

In the fall of 1966 the Commission, the public relations department of the City of Chicago, the Art Institute of Chicago and the U. S. Steel Corporation, the latter being the prime contractor for the construction of the sculpture, began a campaign to publicize the Chicago Picasso. The campaign was directed by Hartmann, with help from Al Weisman head of the public relations department of the advertising firm of Foote, Cone and Belding.

As part of the campaign at least two press showings were conducted. The first was held on September 20, 1966, when the maquette was placed on public exhibition at the Art Institute. No copyright notice was affixed to the maquette. The following notice was, however, posted in the Art Institute:

"The rights of reproduction are the property of the Public Building Commission of Chicago. © 1966. All Rights Reserved."

Press photographers attended the showing at the invitation of the Commission and the Art Institute and later published pictures of the maquette and aluminum model in Chicago newspapers and in magazines of national and international circulation. In addition the Commission supplied photographs of the maquette and the uncopyrighted architect's aluminum model to members of the public who requested them for publication. The second showing took place in December of 1966 when the U. S. Steel Corporation, with the knowledge of the Commission, had completed a twelve-foot six-inch wooden model of the sculpture and invited the press to photograph the model. There was no copyright notice on the model and the pictures were published without copyright notice. U. S. Steel also hired a professional photographer to take pictures of the model and these pictures were used in the publicity drive.

The drive was seemingly successful for pictures of the Picasso design appeared in Business Week Magazine on May 6, 1967, and in Holiday Magazine in March, 1967. Fortune Magazine published three pages of color photographs about the Chicago Picasso including pictures of the U. S. Steel wooden model. The Chicago Sun Times, Midwest magazine published a cover story on the sculpture with a drawing of the maquette on the cover of the magazine. And a picture of the maquette was printed in U. S. Steel News, a house organ with a circulation of over 300,000. None of the photographs or drawings that were published in the above named publications bore any copyright notice whatever.

From June, 1967, through August 13, 1967, the maquette was displayed at the Tate Gallery in London, England. In conjunction with the exhibit at the Tate, a catalog was published wherein a picture of the maquette appeared. Neither on the maquette itself nor on the photograph in the catalog did copyright notice appear. The Commission had knowledge of these facts for on July 6, 1967, Hartmann had sent to the Chairman of the Commission the catalog which was placed in the Commission files.

On August 15, 1967, the monumental sculpture, "The Chicago Picasso" was dedicated in ceremonies on the Civic Center Plaza. The sculpture bore the following copyright:

© 1967 PUBLIC BUILDING COMMISSION OF CHICAGO ALL RIGHTS RESERVED

At the dedication, Mr. Hartmann, co-chairman of the event and master of ceremonies said:

" * * * Pablo Picasso * * * as you know gave the creation of the sculpture to the people of Chicago and his maquette to the Art Institute of Chicago."

The Chairman of the Public Building Commission, in his speech of dedication

to the approximately 50,000 persons assembled for the ceremony said:

"It's an occasion we've all been anticipating—the dedication of this great gift to our city by the world-renowned artist, Pablo Picasso," and

" * * * I dedicate this gift in the name of Chicago and wish it an abiding and happy stay in the City's heart."

In conjunction with the dedication a commemorative souvenir booklet of the Chicago Picasso dedication ceremonies was prepared by the Commission. The booklet which contained drawings and photographs of the maquette and the aluminum model were distributed to 96 distinguished men and women from all areas of Chicago life and to honored guests. Neither the booklet itself, nor any of the photographs shown therein, bore any copyright notice. Also, on the day of the dedication the United States Steel public relations office sent out a press release together with a photo of the monumental sculpture. The photograph bore no copyright notice.

Subsequent to the dedication, the Art Institute published its Annual Report which contained an uncopyrighted picture of the maquette. This publication had a circulation of 40,000 copies, including museums and libraries. The Art Institute also continued selling a photograph of the maquette on a postcard. Between October 1966 and October 1967, 800 copies of this postcard were sold. In 1967, however, the Commission asked the Art Institute to stop selling the postcard and the Art Institute complied with this request.

In October 1967, the Commission caused to be engraved in the granite base of the sculpture the following legend:

"CHICAGO PICASSO

THE CREATION OF THE SCULPTURE WAS GIVEN TO THE PEOPLE OF CHICAGO BY THE ARTIST PABLO PICASSO

THE ERECTION OF THE SCULPTURE WAS MADE POSSIBLE THROUGH THE GENEROSITY OF WOODS CHARITABLE FUND, INC.

CHAUNCEY AND MARION DEERING McCORMICK FOUNDATION

FIELD FOUNDATION OF ILLINOIS

DEDICATED AUGUST 15, 1967

RICHARD J. DALEY, MAYOR."

In November, 1967, the Commission stated its policy that no individuals shall be restricted from "full personal enjoyment of the sculpture, including the right to take photographs and make paintings, etchings and models of the same for personal, non-commercial purposes." The Commission has also had a policy of granting licenses to copy the sculpture for commercial purposes. The Commission requires payment of a nominal fee and a royalty on copies sold. Several such licenses have been granted.

Finally, on January 12, 1968, the Public Building Commission filed its application with the Register of Copyrights asking a copyright in the monumental sculpture entitled "The Chicago Picasso." In due course a certificate of copyright registration was issued to defendant.

STATEMENT OF APPLICABLE LAW

Defendant submits that the attaching of notice to the monumental sculpture on August 4, 1967, and the later registration of the copyright were acts sufficient to obtain a statutory copyright under 17 U.S.C. § 10 [1] and 17 U.S.C. § 11.[2] This

1. *Publication of work with notice*
   Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title; and such notice shall be affixed to each copy thereof published or offered for sale in the United States by authority of the

copyright proprietor, except in the case of books seeking ad interim protection under section 22 of this title. July 30, 1947, c. 391, § 1, 61 Stat. 652.

2. *Registration of claim and issuance of certificate*
   Such person may obtain registration of his claim to copyright by complying with

attempt to establish a statutory copyright must fail, however, if the Chicago Picasso was in the public domain prior to August 4, 1967. Such a conclusion is inescapable given the statutory admonition of 17 U.S.C. § 8 that "[n]o copyright shall subsist in the original text of any work which is in the public domain * * * "

To determine how a work comes to be in the public domain it is necessary to explore the basis of the copyright protection. The common law copyright arises upon the creation of any work of art, be it a first sketch or the finished product.[3] This common law right protects against unauthorized copying, publishing, vending, performing, and recording.[4] The common law copyright is terminated by publication of the work[5] by the proprietor[6] of the copyright. Upon termination of the common law copyright, the work falls into the public domain if statutory protection is not obtained by the giving of the requisite notice.[7]

In some of the early English decisions there was debate as to whether publication did indeed divest its owner of common law protection.[8] Arguing that divestment should not occur upon publication, because of the seeming irrationality of such a rule, Lord Mansfield observed: " 'The copy is made common, because the law does not protect it: and the law can not protect it because it is made common.' "[9]

In the United States, however, it has been clear, from the date the question first reached the Supreme Court, that the common law copyright is terminated upon the first publication.[10] And as Judge Learned Hand noted in National Comics Publications v. Fawcett Publications,[11] citing Donaldson v. Becket,[12] "It is of course true that the publication of a copyrightable 'work' puts that 'work' into the public domain except so far as it may be protected by copyright. That has been unquestioned law since 1774."

One justification for the doctrine, that publication *ipso facto* divests an author of common law copyright protection, can be found in the copyright clause of the United States Constitution.[13] Protection is granted, but only "for limited times." The inclusion of this caveat in the Constitution makes manifest the right of society to ultimately claim free access to materials which may prove essential to the growth of the society. The copyright clause, however, does not impinge on the right of privacy of a creator. An author who refrains

---

the provisions of this title, including the deposit of copies, and upon such compliance the Register of Copyrights shall issue to him the certificates provided for in section 209 of this title. July 30, 1947, c. 391, § 1, 61 Stat. 652.

3. Gold, Protection of the Artist and Sculptor Under the Law of Copyrights, 22 U.Pitt.L.Rev. 710 (1961); Nimmer on Copyright, section 11.2, Matthew Bender Co. (1970).

4. Nimmer, *Ibid*, section 111.

5. Donaldson v. Becket, *infra*, note 8; Wheaton v. Peters, *infra*, note 10; and National Comics Publications v. Fawcett Publications, *infra*, note 11.

6. The proprietor may be the original creator or one to whom the copyright has been given or conveyed. Nimmer, *supra*, note 3, section 120.1; Van Cleef and Arpels, Inc. v. Schechter, 308 F.Supp. 674 (S.D. N.Y.1969)

7. Donaldson v. Becket, *infra*, note 8; Wheaton v. Peters, *infra*, note 10; and National Comics Publications v. Fawcett Publications, *infra*, note 11.

8. Millar v. Taylor, 4 Burr. 2303, 98 Eng. Rep. 201 (1769 KB); *contra*, Donaldson v. Becket, 4 Burr. 2408 (1774).

9. Millar v. Taylor, *ibid*, at 2399.

10. Wheaton v. Peters, 33 U.S. 591, 8 Pet. 591, 8 L.Ed. 1055 (1834).

11. National Comics Publications v. Fawcett Publications, 191 F.2d 594, 598 (2nd Cir. 1951).

12. Donaldson v. Becket, *supra*, note 8.

13. "To promote the Progress of Science and useful Arts, by securing for limited times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries" U.S.Const. Art. I, sec. 8, cl. 8.

from publication and uses his work for his own pleasure may enjoy the common law copyright protection in perpetuity.[14] Once a work is published, however, the Constitution dictates that the time for which the statutory copyright protection is accorded starts to run. An author is not allowed to publish a work and then after a period of time has elapsed choose to invoke statutory copyright protection. If the statutory protection is not acquired at the time of publication by appropriate notice, the work is lost to the public domain. Any other rule would permit avoidance of the "limited times" provision of the Constitution.

■ An exception to this rule is that a limited publication does not divest the holder of his common law protection.[15] A good definition of limited publication can be found in White v. Kimmell[16] wherein the court found that a limited publication is a publication "which communicates the contents of a manuscript to a definitely selected group and for a limited purpose, without the right of diffusion, reproduction, distribution or sale." For example, if an artist shows a painting to a selected group of his friends, for the limited purpose of obtaining their criticism, the publication will be said to be limited and thus not divestive of the artist's common law copyright.

Applying these general principles of copyright law to the facts of the case at bar the court is persuaded that the copyright to the work of art known as the "Chicago Picasso" is invalid. General publication occurred without the requisite notice. Accordingly, the common law protection was lost upon publication and the work was thrust into the public domain.

While this suit could have been resolved on any one of several distinct theories * the court has decided to base its opinion on the proposition that the Chicago Picasso was placed into the public domain prior to the attachment of copyright notice on the monumental sculpture. Accordingly, only cursory reference will be paid to the other issues presented in this action. Even limiting the opinion in this fashion, however, multible and rather sophisticated arguments of the defendant must be met in order to sustain the court's opinion.

## DEFENDANT'S CLAIM THAT THE MODELS DID NOT NEED COPYRIGHT NOTICE

The defendant's basic contention is that the work of art is the properly copyrighted monumental sculpture not the models. In support of this thesis defendant correctly points out that what was always envisioned by the Civic Center architects and Picasso was a monumental sculpture for the Civic Center Plaza. There can only be one copyright in one work of art it is asserted,[17] and that work allegedly is the sculpture in the Civic Center Plaza; not the various models used in its development. It is therefore concluded that copyright notice on the models was unnecessary before publication of the monumental sculpture.

■ The court takes a different view of the facts. When Picasso signed the deed of gift on August 21, 1966, there existed but a single copyright. Picasso

---

14. Number, *supra*, note, 3 section 112.1.

15. American Tobacco Co. v. Werckmeister, 207 U.S. 284, 28 S.Ct. 72, 52 L.Ed. 208 (1907).

16. White v. Kimmell, 193 F.2d 744. 746–747 (9th Cir. 1952).

* The court has found it unnecessary to deal with the following issues: 1) Whether a monumental sculpture of the type at issue can be copyrighted. See Carns, et al. v. Keefe Bros., 242 F. 745 (D.C. Mont.1917) ; 2) Whether the sculpture was dedicated to the public and thus incapable of being copyrighted; 3) Whether a valid copyright can be maintained where the public is totally free to make copies, albeit for non-commercial use; and 4) Whether uncopyrighted copies of the sculpture published after the dedication caused the sculpture to be placed in the public domain.

17. Adventures in Good Eating, Inc. v. Best Places to Eat, Inc., 131 F.2d 809 (7th Cir. 1942).

had a common law copyright in the maquette. He gave the maquette itself to the Art Institute and the right to reproduce it to the defendant. The monumental sculpture did not exist at this point in time and accordingly there could be no copyright in the monumental sculpture, either common law or statutory. It is settled that a copyright can exist only in a perceptible, tangible work.[18] It can not exist in a vision. When Picasso made his deed of gift the monumental sculpture was undeniably but a vision and thus not subject to copyright protection.

The maquette, however, was an original, tangible work of art which would have qualified for statutory copyright protection under 17 U.S.C. § 5(g).[19] The court finds that when the maquette was published without statutory notice Picasso's work was forever lost to the public domain. When the monumental sculpture was finally completed it could not be copyrighted for it was a mere copy, albeit on a grand scale, of the maquette, a work already in the public domain.

## DEFENDANT'S CLAIM THAT DISPLAY OF THE MAQUETTE DID NOT CONSTITUTE GENERAL PUBLICATION

Three arguments have been submitted to the effect that display of the maquette did not constitute general publication. First, defendant urges that display of the maquette at the Art Institute was a "limited" publication and thus did not place the Chicago Picasso in the public domain. In support of this position the defendant's prime authority is American Tobacco Co. v. Werckmeister.[20] In the American Tobacco case an English artist painted a picture depicting a company of gentlemen with filled glasses, singing in chorus. The artist transferred the copyright in the picture to the Berlin Photographic Company, which company made copies of the painting bearing appropriate copyright notice. Immediately subsequent to transferring the copyright the artist, who retained ownership of the painting, placed the picture on exhibit at the Royal Academy. The picture as it hung in the gallery bore no notice of copyright. Several years later the Berlin Photographic Company brought an action claiming that the American Tobacco Company had infringed upon its copyright to the painting. As one of its defenses the American Tobacco Company argued that because the painting had been displayed in a public gallery without copyright notice it had been lost to the public domain and accordingly, the copyright was invalid. The court rejected this argument finding that the display in the gallery amounted to a limited publication and thus did not operate to divest the holder of the copyright of its rights. The basis for this decision was the finding that absolutely no copies were permitted to be made by anyone viewing the picture at the gallery. In fact, it was noted that guards were stationed in the gallery to rigidly enforce the rule of the Royal Academy that no copying take place. The court properly decided that the rational basis for the notice requirement would not be transgressed by showing a picture bearing no notice where that picture could not be copied. In closing dicta the Court in American Tobacco noted: "We do not mean to say that the public exhibition of a painting or statue, where all might see and freely copy it, might not amount to publication within the statute, regardless of the artist's purpose

---

18. Baker v. Selden, 101 U.S. 99, 25 L.Ed. 841 (1879); Nimmer, *supra*, note 3, section 8.2; Katz, Copyright Protection of Architectural Plans, Drawings, and Designs, 19 Law and Contemp. Prob., 224, 232 (1954).

19. *Classification of works for registration*
    The application for registration shall specify to which of the following classes the work in which copyright is claimed belongs: * * * (g) Works of art; models or designs for works of art.

20. American Tobacco Co. v. Werckmeister, *supra*, note 15.

or notice of reservation of rights which he takes no measure to protect." [21]

It is this court's finding that the case at bar more closely resembles the situation postulated in the aforementioned dicta than it does the actual facts of the American Tobacco case. In the case at bar there were no restrictions on copying and no guards preventing copying. Rather every citizen was free to copy the maquette for his own pleasure and camera permits were available to members of the public.[22] At its first public display the press was freely allowed to photograph the maquette and publish these photographs in major newspapers and magazines. Further, officials at this first public showing of the maquette made uncopyrighted pictures of the maquette available upon request. Were this activity classified as limited publication, there would no longer be any meaningful distinction between limited and general publication. The activity in question does not comport with any definition of limited publication. Rather, the display of the maquette constituted general publication.[23]

Defendant's second assertion is that the display of the maquette was inconsequential since an unpublished work, model thereof, or copy thereof does not require a copyright notice.[24] The court has no quarrel with this statement of law. The problem with this argument, however, is that it begs the question of whether or not there was general publication. Since there was general publication of the maquette, notice was required.

Finally, defendant argues that the Art Institute did not hold the copyright to the maquette and therefore could not have placed notice on the maquette. The answer to this assertion is that the Commission, the alleged holder of the copyright, was required to insure that proper notice was placed on the maquette. The Commission was able to place improper notice at the showing, i. e., notice in the room, but it did not comply with the statutory requirement that notice be placed on the work itself in order to be effective.[25]

## DEFENDANT'S CLAIM THAT UNCOPYRIGHTED PICTURES COULD BE USED IN THE PUBLICITY CAMPAIGN

The defendant's major defense to the use of uncopyrighted pictures of the models in the publicity drive is what appears to be an inverse application of the doctrine of "fair use". Generally it can be stated that certain acts of copying are defensible as "fair use".[26] The doctrine of fair use, however, was meant to be used and has only been used, as a defense in infringement actions.[27] The defendant can not cite a single authority to support its unique claim that the doctrine can be asserted to excuse a failure to put copyright notice on copies of a work of art intended for distribution to the press. The court after diligent research has also failed to find any support for the defendant's position. It seems appropriate to ask why defendant's desire for wide and favorable distribution of copies of the maquette and the other models could not have been fulfilled by distribution of pictures which had copyright notice printed on them?

Defendant has an additional defense to the uncopyrighted printing of pictures of the maquette, the wooden model, and the aluminum model. It is

21. American Tobacco Co. v. Werckmeister, *supra*, note 15, 207 U.S. at 300, 28 S.Ct. at 77.

22. The Art Institute camera regulations do, however, require that permission be obtained in order to use photographic copies of works of art commercially.

23. Morton v. Raphael, 334 Ill.App. 399, 79 N.E.2d 522 (1948).

24. Nimmer, *supra*, note 3, Section 89.1.

25. 17 U.S.C. § 10 *supra*, note 1.

26. Nimmer, *supra*, note 3, section 145; Copyright Fair Use–Case Law and Legislation, 1969 Duke L.J. 74.

27. Nimmer, *supra*, note 3, section 149.

contended that the copies of the work of art that appeared in various newspapers and mazagines without notice did not amount to divesting publication because these pictures were protected under the copyright secured by the media in their own publication. It is settled law that if a work is published in the press, without a separate notice in the name of the holder of the copyright of the work in question, that work has been published without valid notice.[28] Defendant contends that the above statement of law has been overruled by Goodis v. United Artists Television Inc.[29] and that the Goodis case supports its position that the press copyright protects the interests of the work's owner. The issue in the Goodis case was "whether a magazine publisher who acquires only the right to serialize a novel before it is published in book form. has such an interest in the work that notice of copyright in the publisher's name will protect the copyright of the author of the novel." [30] The court in finding that the publisher's copyright did protect the author, based its opinion on the fact that the magazine had purchased a property interest in the novel, i. e., the right of first publication. Thus, the court found that the publisher's notice was sufficient since the magazine had obtained proprietorship of a portion of the copyright to the novel. The basic issue that the Goodis court decided was whether the doctrine of indivisibility of copyright was applicable to the situation presented in that case.

The case at bar is distinguishable from the Goodis decision for in the instant case the newspapers and magazines that published the pictures of the work of art did not have as the Goodis court said, "such an interest in the work that notice of copyright in the publisher's name will

protect the copyright * * *." [31] The publishers in the case at bar had no interest whatever in the pictures of the work that they published. Accordingly, the court finds that the copyrights of the publishers in their own publications do not serve to rescue the defendant's copyright in this case.

## DEFENDANT'S CLAIM THAT PUBLICATION OF PICTURES OF THE MODELS CONSTITUTED INFRINGEMENT

The last major defense that the defendant advances in an attempt to excuse the uncopyrighted publication of the work of art is that the publications constituted unauthorized infringement, and therefore they did not place the work in the public domain.[32] In a letter to Hartmann, before the deed of gift was signed, which letter the defendant characterizes as, "instructions to architects", the following directions were set out:

"In order for the PUBLIC BUILDING COMMISSION to preserve all rights in and to this work of art, it is essential that every publication of the work, whether of the maquette, photographs of the maquette, or the ultimate monumental sculpture, bear the following notice:

"© 1966 Public Building Commission of Chicago All Rights Reserved

"The notice must appear legibly on an exposed surface of the sculpture. Since notice is the essence of protection, we suggest consultation between us before publication of the work in any form.

"Would you, or someone at your office, see that the photographs, drawings,

---

28. Nimmer, *supra*, note 3, section 119.32; McDaniel v. Friedman, 98 F.2d 745 (7th Cir. 1938); Kaplan v. Fox Film Corporation, 19 F.Supp. 780 (S.D.N.Y. 1937).

29. Goodis v. United Artists Television, Inc., 425 F.2d 397 (2nd Cir. 1970).

30. *Ibid*, p. 398.

31. *Ibid*.

32. Nimmer, *supra*, note 3, section 82.

and all other reproductions of this work of art are marked with the foregoing copyright notice."

Also, in its contract with the builder of the sculpture the defendant included provisions requiring that notice be placed on the sculpture and on all reproductions and drawings of the design.

Given these instructions the defendant argues that many of the instances of publication were actually acts of infringement because they were unauthorized and accordingly did not defeat defendant's copyright. The court has found no evidence for the period before notice was attached to the monumental sculpture on August 4, 1967, that the Commission intended to have its orders carried out. Rather, the great bulk of the evidence before the Court, shows that the Commission itself disregarded its own instructions. That instead of objecting to uncopyrighted publications, the Commission passively and in some cases actively engaged in the distribution of uncopyrighted pictures promoting the Chicago Picasso. The court on the facts before it could not find that any of the publications here in question constituted unauthorized infringing publications. Accordingly, this last defense submitted by the defendant must be rejected.

An analysis of the legal issues presented in this action compels the conclusion that the copyright to the Chicago Picasso is invalid due to the fact that the sculpture has entered the public domain. This decision comports with a strict adherence to copyright law and is also in consonance with the policy of enriching society which underlies our copyright system. The broadest and most uninhibited reproduction and copying of a provocative piece of public sculpture can only have the end result of benefiting society.

For all of the foregoing reasons this court hereby enters summary judgment in favor of the plaintiff and against the defendant.