ANDERSON, Chief Judge:
The Estate of Martin Luther King, Jr., Inc. brought this copyright infringement action against CBS, Inc. after CBS produced a video documentary that used, without authorization, portions of civil rights leader Dr. Martin Luther King’s *1213 famous “I Have a Dream” speech at the March on Washington on August 28, 1968. The district court granted summary judgment to CBS on the ground that Dr. King had engaged in a general publication of the speech, placing it into the public domain. See Estate of Martin Luther King, Jr., Inc. v. CBS, Inc., 13 F.Supp.2d 1847 (N.D.Ga.1998). We now reverse.**
I. FACTS
The facts underlying this case form part of our national heritage and are well-known to many Americans. On the afternoon of August 28, 1963, the Southern Christian Leadership Conference (“SCLC”) held the March on Washington (“March”) to promote the growing civil rights movement. The events of the day were seen and heard by some 200,000 people gathered at the March, and were broadcast live via radio and television to a nationwide audience of millions of viewers. The highlight of the March was a rousing speech that Dr. Martin Luther King, Jr., the SCLC’s founder and president, gave in front of the Lincoln Memorial (“Speech”). The Speech contained the famous utterance, “I have a dream ...,” which became symbolic of the civil rights movement. The SCLC had sought out wide press coverage of the March and the Speech, and these efforts were successful; the Speech was reported in daily newspapers across the country, was broadcast live on radio and television, and was extensively covered on television and radio subsequent to the live broadcast.
On September 30, 1963, approximately one month after the delivery of the Speech, Dr. King took steps to secure federal copyright protection for the Speech under the Copyright Act of 1909, and a certifícate of registration of his claim to copyright was issued by the Copyright Office on October 2, 1963. Almost immediately thereafter, Dr. King filed suit in the Southern District of New York to enjoin the unauthorized sale of recordings of the Speech and won a preliminary injunction on December 13, 1963. See King v. Mister Maestro, Inc., 224 F.Supp. 101 (S.D.N.Y.1963).
For the next twenty years, Dr. King and the Estate enjoyed copyright protection in the Speech and licensed it for a variety of uses, and renewed the copyright when necessary. In 1994, CBS entered into a contract with the Arts & Entertainment Network to produce a historical documentary series entitled “The 20th Century with Mike Wallace.” One segment was devoted to “Martin Luther King, Jr. and The March on Washington.” That episode contained material filmed by CBS during the March and extensive footage of the Speech (amounting to about 60% of its total content). CBS, however, did not seek the Estate’s permission to use the Speech in this manner and refused to pay royalties to the Estate. The instant litigation ensued.
On summary judgment, the district court framed the issue as “whether the public delivery of Dr. King’s speech ... constituted a general publication of the speech so as to place it in the public domain.” 13 F.Supp.2d at 1351. After discussing the relevant case law, the district court held that Dr. King’s “performance coupled with such wide and unlimited reproduction and dissemination as occurred concomitant to Dr. King’s speech during the March on Washington can be seen only as a general publication which thrust the speech into the public domain.” Id. at 1354.[1] Thus, the district court granted *1214 CBS’s motion for summary judgment. The Estate now appeals to this Court.
II. DISCUSSION
We review the district court’s grant of summary judgment de novo, with all facts and reasonable inferences therefrom reviewed in the light most favorable to the nonmoving party. See Hale v. Tallapoosa County, 50 F.3d 1579, 1581 (11th Cir.1995). Summary judgment was due to be granted only if the forecast of evidence before the district court showed that there was no genuine issue as to any material fact and that the moving party, i.e., CBS, was entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c).
Because of the dates of the critical events, the determinative issues in this case are properly analyzed under the Copyright Act of 1909 (“1909 Act”), rather than the Copyright Act of 1976 (“1976 Act”) that is currently in effect. See Brown v. Tabb, 714 F.2d 1088, 1091 (11th Cir.1983) (“[T]he determination whether a work entered the public domain prior to the effective date of the 1976 Act must be made according to the copyright law as it existed before that date.”). The question is whether Dr. King’s attempt to obtain statutory copyright protection on September 30, 1963 was effective, or whether it was a nullity because the Speech had already been forfeited to the public domain via a general publication.[2]
Under the regime created by the 1909 Act, an author received state common law protection automatically at the time of creation of a work. See 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 4.01[B] (1998) [hereinafter Nimmer ]. This state common law protection persisted until the moment of a general publication.[3] See Silverman v. CBS Inc., 632 F.Supp. 1344, 1353 (S.D.N.Y.1986). When a general publication occurred, the author either forfeited his work to the public domain, see, e.g., White v. Kimmell, 193 F.2d 744 (9th Cir.1952), or, if he had therebefore complied with federal statutory requirements, converted his common law copyright into a federal statutory copyright. See Mister Maestro, 224 F.Supp. at 105 (“The [statutory] copyright may be obtained before publication of such works but as soon as publication occurs there must be compliance with the requirements as to published works.”); see generally 1 Nimmer § 4.01[B].
In order to soften the hardship of the rule that publication destroys common law rights, courts developed a distinction between a “general publication” and a “limited publication.” Brown, 714 F.2d at 1091 (citing American Vitagraph, Inc. v. Levy, 659 F.2d 1023, 1026-27 (9th Cir.1981)). Only a general publication divested a common law copyright. See id. A general publication occurred “when a work was made available to members of the public at large without regard to their identity or what they intended to do with the work.” Id. (citing Burke v. National Broadcasting Co., 598 F.2d 688, 691 (1st Cir.1979)). Conversely, a non-divesting limited publication was one that qommuni-cated the contents of a work to a select *1215 group and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale. See id. (citing White, 193 F.2d at 746-47). The issue before us is whether Dr. King’s delivery of the Speech was a general publication.
Numerous cases stand for the proposition that the performance of a work is not a general publication. See, e.g., Ferris v. Frohman, 223 U.S. 424, 433, 32 S.Ct. 263, 265, 56 L.Ed. 492 (1912) (“The public representation of a dramatic composition, not printed and published, does not deprive the owner of his common-law right.... [T]he public performance of the play is not an abandonment of it to the public use.”); Nutt v. National Inst. Incorporated for the Improvement of Memory, 31 F.2d 236, 238 (2d Cir.1929) (“The author of a literary composition, as a lecture, may profit from public delivery, but that does not constitute the kind of publication which deprives him of the protection of the copyright statute-”); Mister Maestro, 224 F.Supp. at 106 ( “The copyright statute itself plainly shows that ‘oral delivery’ of an address is not a dedication to the public.”); McCarthy & Fischer, Inc. v. White, 259 F.Supp. 364, 364 (S.D.N.Y.1919) (rejecting infringer’s argument that “the presentation of the song ... in vaudeville prior to the date of copyright was a complete dedication to the public,” because “[i]t is ... well settled that the public performance of a dramatic or musical composition is not an abandonment of the composition to the public”); Columbia Broad. Sys., Inc. v. Documentaries Unlimited, Inc., 42 Misc.2d 723, 248 N.Y.S.2d 809, 811 (Sup.Ct.1964) (holding with respect to news anchor’s famous announcement of the death of President Kennedy that “[t]he rendering of a performance before the microphone does not constitute an abandonment of ownership or a dedication of it to the public at large”); cf. American Tobacco Co. v. Werckmeister, 207 U.S. 284, 299, 28 S.Ct. 72, 77, 52 L.Ed. 208 (1907) (no general publication where there is merely “the exhibition of a work of art at a public exhibition”); Burke, 598 F.2d at 693 (“Publication did not occur merely because the film was shown to the general public.”); Patterson v. Century Prods., Inc., 93 F.2d 489, 492-93 (2d Cir.1937) (no divestive general publication of motion picture occurred where “the distribution was limited to exhibitions of the picture without charge, no one was given the right to use the copies sent out for any purpose whatsoever,” and “[t]he positive films were merely loaned for that purpose which did not permit copying”); see generally Nimmer § 4.08, at 4-43 (“[T]he oral dissemination or performance of a literary, dramatic, or musical work does not constitute a publication of that work.”).
It appears from the case law that a general publication occurs only in two situations. First, a general publication occurs if tangible copies of the work are distributed to the general public in such a manner as allows the public to exercise dominion and control over the work. See Burke, 598 F.2d at 693 (“The decisive issue was whether [the author’s] release of the film itself to [a third party] was, under the circumstances, a general publication.”); Mister Maestro, 224 F.Supp. at 107 (“ ‘A sine qua non of publication should be the acquisition by members of the public of a possessory interest in tangible copies of the work in question.’ ”) (quoting Nimmer, supra, 56 Colum. L.Rev. at 197); Nimmer, supra, 56 Colum. L.Rev. at 196 (“[E]ven if a performance were regarded as a copy of the work being performed, the act of publication would not occur merely by virtue of viewing the performance since an audience does not thereby gain such dominion over the copy as to warrant the conclusion that the work has been surrendered to the public.”). Second, a general publication may occur if the work is exhibited or displayed in such a manner as to permit unrestricted copying by the general public. See American Tobacco, 207 U.S. at 300, 28 S.Ct. at 77 (“We do not mean to say that the public exhibition of a painting or statue, where all might see and freely copy it, might not amount to [divestive] publication....”); Patterson, 93 F.2d at 492 *1216 (“The test of general publication is whether the exhibition of the work to the public is under such conditions as to show dedication without reservation of rights or only the right to view and inspect it without more.”); Letter Edged in Black Press, Inc. v. Public Bldg. Comm’n of Chicago, 320 F.Supp. 1303, 1311 (N.D.Ill.1970) (invoking this exception where “there were no restrictions on copying [of a publicly displayed sculpture] and no guards preventing copying” and “every citizen was free to copy the maquette for his own pleasure and camera permits were available to members of the public”). However, the case law indicates that restrictions on copying may be implied, and that express limitations in that regard are deemed unnecessary. See American Tobacco, 207 U.S. at 300, 28 S.Ct. at 77 (holding that there is no general publication where artwork is exhibited and “there are bylaws against copies, or where it is tacitly understood that no copying shall take place, and the public are admitted ... on the implied understanding that no improper advantage will be taken of the privilege” (emphasis added)); Burke, 598 F.2d at 693 (holding that releasing a film to a professor and host of an educational television program, and authorizing him to copy and broadcast same on public television was a limited publication because the grant of permission to use the film contained an implied condition against distributing copies of the film to others or using it for other purposes); Nutt, 31 F.2d at 238 (lectures were not generally published when delivered because oral delivery is not publication, and “[e]ven where the hearers are allowed to make copies of what was said for their personal use, they cannot later publish for profit that which they had not retained the right to sell”).
The case law indicates that distribution to the news media, as opposed to the general public, for the purpose of enabling the reporting of a contemporary newsworthy event, is only a limited publication. For example, in Public Affairs Assoc., Inc. v. Rickover, 284 F.2d 262 (D.C.Cir.1960), vacated on other grounds, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962), the court said that general publication occurs only when there is “a studied effort not only to secure publicity for the contents of the addresses through the channels of information, but to go beyond customary sources of press or broadcasting in distributing the addresses to any interested individual.” Id. at 270 (emphasis added). Although the Rickover court ultimately held that a general publication had occurred, it contrasted the “limited use of the addresses by the press for fair comment,” i.e., limited publication, with “the unlimited distribution to anyone who was interested,” i.e., general publication. Id. at 271. See also Mister Maestro, 224 F.Supp. at 107 (taking the position that solicitation of news coverage and distribution to the media amounts to only a limited publication); cf. Documentaries Unlimited, Inc., 248 N.Y.S.2d at 810-11 (news anchor’s announcement concerning the assassination of President Kennedy was not generally published by virtue of the broadcast over the radio as newsworthy material). This rule comports with common sense; it does not force an author whose message happens to be newsworthy to choose between obtaining news coverage for his work and preserving his common-law copyright. As the dissenting judge in the Rickover case remarked (which remark was entirely consistent with the majority opinion in the case), “[t]here is nothing in the law which would compel this court to deprive the creator of the right to reap financial benefits from these efforts because, at the time of their creation, they had the added virtue of being newsworthy events of immediate public concern.” Rickover, 284 F.2d at 273 (Washington, J., dissenting).
With the above principles in mind, in the summary judgment posture of this case and on the current state of this record, we are unable to conclude that CBS has demonstrated beyond any genuine issue of material fact that Dr. King, simply through his oral delivery of the *1217 Speech, engaged in a general publication making the Speech “available to members of the public at large without regard to their identity or what they intended to do with the work.” Brown, 714 F.2d at 1091. A performance, no matter how broad the audience, is not a publication; to hold otherwise would be to upset a long line of precedent. This conclusion is not altered by the fact that the Speech was broadcast live to a broad radio and television audience and was the subject of extensive contemporaneous news coverage. We follow the above cited case law indicating that release to the news media for contemporary coverage of a newsworthy event is only a limited publication.[4]
Our conclusion finds significant support from Burke v. National Broadcasting Co., Inc., 598 F.2d 688 (1st Cir.1979). Burke captured on film a highly unusual and dramatic encounter in which a zebra attacked a lioness who had killed the zebra’s foal. See id. at 689. Grzimek, a professor and a host of an educational television program, wrote Burke requesting permission to use the film in his lectures and in the educational television program. See id. at 690. Burke responded affirmatively, sending Grzimek the film accompanied by a short reply that contained neither express authorization nor express restriction with respect to other possible uses of the film. See id. at 690, 698. Grzimek initially used the film only for the stated purposes, but later transmitted a copy of the film to a commercial company specializing in nature films, which in turn sold a production that included the film to NBC. The issue was whether Burke’s common law copyright was forfeited to the public domain by virtue of the circumstances surrounding his seemingly unconditioned release of the film to Grzimek. In other words, the issue was whether there had been a general publication. The First Circuit held that only a limited publication had occurred, *1218 and that Burke’s common law copyright had not been lost. See id. at 694. The court defined a general publication as occurring when a work is made available to the public at large without regard to who they are or what they propose to do with it, see id. at 691; noted that courts have hesitated to find a general publication which divests a common law copyright, see id.; and noted the settled law that a mere performance or exhibition of a work is not a general publication. See id. Recognizing that a general publication can be found if the public were free to copy the work on exhibit, the First Circuit held that a prohibition on copying can be tacitly understood. See id. (citing American Tobacco, 207 U.S. at 300, 28 S.Ct. 72). Applying the foregoing principles, the court sustained Burke’s common law copyright as against NBC. See id. at 690, 694. The Burke court held that Burke’s authorization of Grzimek’s broadcast of the film on noncommercial television did not result in a general publication. See id. at 693 (“Allowing the film to be used for the purposes requested was not a blanket authorization to use it for any purpose, much less to reléase it to a commercial producer.”). The court recognized that Burke did not explicitly state that Grzimek could not distribute copies of the film to others, or use it for other purposes, but the court said “such limitations are reasonably to be implied.” Id.
We believe that the authority granted to the press in the instant case — extensive news coverage including live broadcasts — • is analogous to the authority granted in Burke. In Burke, authority was granted to the host of an educational television program to broadcast on television; in the instant case, authority was granted to the press for extensive news coverage, also including broadcasts on television. In both cases, the authority was granted to a limited group for a limited purpose. In both cases, the restrictions on copying and reproducing were implied. The soundness of our analogy to Burke is also supported by the foregoing case law indicating generally that distribution to the news media for the purpose of news coverage is only a limited publication.
The district court held that “the circumstances in this case take the work in question outside the parameters of the ‘performance is not a publication’ doctrine.” 13 F.Supp.2d at 1351. These circumstances included “the overwhelmingly public nature of the speech and the fervent intentions of the March "organizers to draw press attention.” Id. Certainly, the Speech was one of a kind — a unique event in history.[5] However, the features that make the Speech unique' — e.g., the huge audience and the Speech’s significance in terms of newsworthiness and history — are features that, according to the case law, are not significant in the general versus limited publication analysis. With respect to the huge audience, the case law indicates that the general publication issue depends, not on the number of people involved, but rather on the fact that the work is made available to the public without regard to who they are or what they propose to do with it. See Brown v. Tabb, 714 F.2d 1088, 1091-92 (11th Cir.1983). For this proposition, Brown cited Burke, 598 F.2d at 691 (“[GJeneral publication depends on the author making the work available to those interested, and not on the number of people who actually express an interest.”). To the same effect, see Mister Maestro, 224 F.Supp. at 106-07 (relying upon the “one or many persons” language in American Tobacco, 207 U.S. at 299, 28 S.Ct. 72, and on Rickover). In the instant case, the district court acknowledged that “[t]he size of the audience before which a work is performed cannot be the basis for a court’s finding that a general publication has occurred.” 13 F.Supp.2d at 1352.
*1219 With respect to the significance of the Speech in terms of newsworthiness and history, the case law again suggests that this feature should not play a substantial role in the analysis. As noted above, the D.C. Circuit in Rickover indicated that the wide press distribution of the speeches at issue there would not alone have constituted a general publication. Indeed, Mister Maestro so held with respect to the very Speech at issue before us. Also supporting this proposition is the case law above cited to the effect that size of the audience is not significant.
The district court cited Letter Edged in Black Press, Inc. v. Public Bldg. Comm’n of Chicago, 320 F.Supp. 1303 (N.D.Ill. 1970), CBS’s best case, in support of its reasoning, see 13 F.Supp.2d at 1353-54, and that case warrants some exploration. In Letter Edged in Black, the question was whether the city had dedicated a Picasso sculpture (located in front of the Chicago Civic Center) to the public domain by general publication. The city had done the following: it carried out a massive campaign to publicize the monumental sculpture; it placed a maquette (portable model of the sculpture) on exhibition at a local museum; it gave photographs to the public upon request; it arranged for pictures of the sculpture to appear in several magazines of large national circulation; it sold a postcard featuring the sculpture; and it distributed numerous publications and reports containing photographs of the sculpture. See Letter Edged in Black, 320 F.Supp. at 1306-07. After stating the controlling legal principles with regard to general and limited publication, the Letter Edged in Black court stated its view that the cumulation of these various acts by the city equated to general publication. See id. at 1309. The court then distinguished American Tobacco, 207 U.S. 284, 28 S.Ct. 72, 52 L.Ed. 208, the primary authority that the city cited to support its theory of mere limited publication. In American Tobacco, the Supreme Court held that the display of a painting in a gallery did not constitute general publication putting the painting into the public domain. According to the Letter Edged in Black court, a cornerstone of American Tobacco was the fact that copying of the painting was strictly forbidden and the gallery strictly enforced the anti-copying rules. See Letter Edged in Black, 320 F.Supp. at 1310. The court held that the facts in Letter Edged in Black were distinguishable:
In the case at bar there were no restrictions on copying and no guards preventing copying. Rather every citizen was free to copy the maquette for his own pleasure and camera permits were available to members of the public. At its first public display the press was freely allowed to photograph the maquette and publish these photographs in major newspapers and magazines. Further, officials at this first public showing of the maquette made uncopyrighted pictures of the maquette available on request. Were this activity strictly classified as limited publication, there would no longer be any meaningful distinction between limited and general publication.
Id. at 1311 (footnotes omitted).
The district court likened the instant ease to Letter Edged in Black on the ground that there was a lack of restriction on copying and free allowance of reproduction by the press. However, we do not believe the analogy fits — at least not at this summary judgment stage. Significantly, in Letter Edged in Black there were manifestations of the city’s intent to distribute generally among the public at large that have no parallels in the evidence we can consider in the instant summary judgment posture. The city gave photographs of the sculpture to the public, not merely the press, upon request. The city commercially sold a postcard featuring the sculpture. Copying was apparently widespread at an exhibit of the sculpture, and the city took no action to curtail copying and photographing by the public. See Letter Edged in Black, 320 F.Supp. at 1306-07, 1311. At trial, CBS may well produce *1220 evidence that brings the instant case on all fours with Letter Edged in Black,[6] but the present state of the record does not support the analogy; to the contrary, the performance of the Speech in the instant case is more like the exhibition of the painting in the gallery in American Tobacco.[7]
Because there exist genuine issues of material fact as to whether a general publication occurred, we must reverse the district court’s grant of summary judgment for CBS. It would be inappropriate for us to address CBS’s other arguments, e.g., fair use and the First Amendment, because the district- court did not address them, and because the relevant facts may not yet be fully developed. Of course, we express no opinion on the eventual merits of this litigation. The judgment of the district court is reversed and remanded for further proceedings not incohsistent with this opinion.
REVERSED AND REMANDED.[8]

 Chief Judge Anderson and Judge Cook comprise the majority holding that there has been no publication of the speech that destroyed Dr. King’s common law copyright protection. Chief Judge Anderson’s reasoning is set out in this opinion; Judge Cook’s related but somewhat different reasoning is set out in his separate opinion.

. The district court noted that there potentially was some additional evidence of general publication. First, the SCLC published a newsletter of wide circulation containing the full text of the Speech. Second, an advance text of the Speech may have been freely available to the public in a press tent at the March. *1214 However, the district court disregarded both of these items of evidence because the procedural posture of the case was one of summary judgment, and “material facts [were] in dispute as to whether the use of Dr. King’s speech in the newsletter was authorized and also as to the actual availability of the advance text.” 13 F.Supp.2d at 1353 n. 5.

. If Dr. King and the Estate had a valid copyright in the Speech under the 1909 Act, that copyright was carried forward under the 1976 Act pursuant to the provisions of 17 U.S.C. § 304. In 1991, the copyright in the Speech was duly renewed.

. We stress that in this area of tire law the word "publication” is "a legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term.” Melville B. Nimmer, Copyright Publication, 56 Colum. L.Rev. 185, 185 (1956).

. We emphasize the summary judgment posture of this case, which necessitates that we disregard evidence that may be important or even dispositive at trial. In other words, in this summary judgment posture, we consider only the evidence with respect to which there is no genuine issue of material fact. This evidence includes only the fact of the oral delivery of the Speech to a large audience and the fact that the sponsors of the event including Dr. King sought and successfully obtained live broadcasts on radio and television and extensive contemporary coverage in the news media. In this regard, we do not consider at this stage of the litigation two potentially important pieces of evidence brought to our attention by CBS. First, an advance text of the Speech was apparently available in a press tent on the day of the speech. According to an eyewitness affidavit submitted by CBS, members of the public at large — not merely the press — were permitted access to the press tent and were given copies of the advance text. However, the Estate has proffered affidavits which contradict the statements of the CBS witness, and suggest that access was controlled by the SCLC within reasonable means. Moreover, the Estate argues that much of the content of the Speech was generated extemporaneously by Dr. King and was not contained in this advance text — an argument that we do not consider but that can be explored by the district court. Finding genuine issues of material fact with respect to the availability of the advance text to the general public, the district court disregarded CBS’s allegations in this regard. 13 F.Supp.2d at 1353 n. 5. We agree, and do likewise.
Second, CBS has produced a September 1963 issue of the SCLC's newsletter in which the text of the Speech was reprinted in its entirety, with no copyright notice. The newsletter was widely circulated to the general public. Indeed, at oral argument, the Estate conceded that this reprinting of the Speech and wide distribution of the newsletter would constitute a general publication, if it were authorized by Dr. King. However, the Estate has raised the issue that Dr. King did not authorize this reprinting and distribution of the Speech. Finding genuine issues of fact in this regard, the district court disregarded this evidence. We agree, and do likewise.
Finally, we note that the opinion in Mister Maestro, 224 F.Supp. at 104, suggests that there may have been evidence of subsequent rebroadcasts of the Speech in movie houses and sales of phonograph records. We do not consider any such evidence because CBS has not argued in this appeal that such evidence is relevant at this stage. Moreover, the opinion in Mister Maestro suggests that there may be genuine issues of material fact (e.g., authorization) with respect to such evidence.

. The district court stated that “as one of the most public and most widely disseminated speeches in history, [the Speech] could be the poster child for general publications.” 13 F.Supp.2d at 1353.

. For example, if the SCLC's reprinting of the text of the Speech in the September 1963 newsletter was authorized, see supra note 4, that reprinting might be analogous to the public distribution of photographs in Letter Edged, in Black. Similarly, if CBS were to adduce evidence that Dr. King or his agents offered copies of the Speech indiscriminately to any member of the public who requested them, e.g., through the availability of the advance text in the press tent, that would make the facts of the instant case closer to those of Letter Edged in Black.

. Public Affairs Associates, Inc. v. Rickover, where the D.C. Circuit found a general publication by virtue of Admiral Rickover’s distribution to the public of copies of his speeches, is also factually distinguishable. " 'In distributing the speeches, Admiral Rickover mailed some [copies] to individuals who had requested copies or who[m] Admiral Rickover believed would be interested in the subject. Some were sent by Admiral Rickover, approximately 50 in each case, to the sponsor of the speech to be made available to the press and others at the place where the speech was to be delivered.' ” Rickover, 284 F.2d at 266 (emphasis added) (quoting the parties' agreed statement of facts). In short, as the court observed, ''[a]nyone was welcome to a copy.” Id. at 271. The present state of the record in the instant case does not allow us to draw similar conclusions with respect to Dr. King’s Speech.

.The Estate also argued that the Newsletter should be excluded because CBS erroneously invoked the attorney work product doctrine to excuse its late disclosure of the Newsletter, and because such a violation of CBS's discovery obligations warrants suppression of the evidence. We decline to address the work product issue because our opinion on appeal expressly does not rely upon the Newsletter, see supra note 4, and because it is not at all clear that the district court would have suppressed the evidence even if there had been a discovery violation. I am authorized to say that Judge Roney joins in this regard.