**WHITE v. KIMMELL et al.**

No. 12862.

United States Court of Appeals
Ninth Circuit.

Jan. 7, 1952.

Rehearing Denied Feb. 21, 1952.

Schauer, Ryon & McMahon, Robert W. McIntyre, Thomas M. Mullen, Santa Barbara, Cal., for appellant.

Leslie F. Kimmell, Laguna Beach, Cal., for appellees.

Before STEPHENS and HEALY, Circuit Judges, and McCORMICK, District Judge.

HEALY, Circuit Judge.

Appellant sought a declaratory judgment that a manuscript entitled "Gaelic," authored by Stewart Edward White, and a certain book by the same author entitled "The Job of Living," based on the Gaelic manuscript and quoting from it, are in the public domain and may be quoted without infringement of the copyright claimed by appellee Kimmell or the common-law proprietary rights claimed by her in Gaelic. For convenience appellant will be referred to as the plaintiff, appellee Kimmell as the defendant, and Stewart Edward White as White.

Some preliminary attention should be given the nature of the Gaelic manuscript. Gaelic is supposedly the spirit of an individual who had departed this world and become an invisible non-material entity. The work embodies communications from Gaelic, received chiefly by White's wife. The communications were written down by various individuals, and were subsequently, between about 1920 and 1930, reduced to manuscript form by White. The latter identified Gaelic as his and his wife's "nickname for what seemed to us a single and definite personality, apparently detailed to tell us what made the wheels go round."

Plaintiff's complaint avers that the Gaelic manuscript was abandoned by White to the general public by his reproducing and distributing copies himself and permitting others to do the same without limitation as to use or right to republish and without notice of claim of copyright. The defendant relies on a transfer to her by White of his interest in his work as establishing her exclusive right to quote from Gaelic. This transfer was made in October 1944, about two years before White's death.

The court found that the reproduction and distribution of the manuscript amount-ed to a limited and restricted publication only; that there was no general publication of it, and that the manuscript is not in the public domain. D.C., 94 F.Supp. 502. The sole issue here is whether these findings are justified by the evidence. We think they are not.

The testimony is not in conflict, although as will later appear, portions of it do exhibit contrasts. The following is a fair summary of the showing made on the part of the plaintiff: In the fall of 1933 mimeographed stencils of the Gaelic manuscript were cut and run off by a Mrs. Maguire, White's secretary, at the instance of White.[1] Originally sixty or seventy copies were made. The secretary, at White's request, mailed out eighteen or twenty of them to a list of persons furnished her by White, together with a letter of transmittal. In this letter White stated in part that he had "finally made some extra copies of 'Gaelic' because so many of you wanted them. * * * I am glad to know of your interest, and I wish you to read it, to use it as you like, and pass it on to others, and for as long a time as you can. If you get through with it, you might return it to me to hand to someone else. Otherwise, you are at liberty to keep it." Later, additional copies were mailed out by the secretary at the request of White with the same letter of transmittal. White left four or five copies with the secretary which she gave to friends or clients of hers who were interested in the manuscript. White was not acquainted with these persons. He at no time made any statement to the secretary or to anyone in her presence limiting the use of the Gaelic manuscript by persons receiving it. The distribution was not made to a group or association. A second run of forty or fifty copies was later made by the secretary. These were distributed by White in part to friends and in part to strangers who wrote him requesting a copy. No limitation was expressed by White to the donee as to the use which might be made of Gaelic. At the time of White's death, only two copies were found in his possession. He never sold a copy to any-

---

1. This witness had been White's secretary from 1919 or 1920 and remained such until the time of his death.

one. So runs the testimony of the secretary.

Near the end of 1940 a witness, Margaret Oettinger of Palo Alto, wrote to White, whom she did not know, requesting a copy of Gaelic. When informed there were none left, she wrote asking permission to make mimeographed copies for herself. White wrote her that she was at liberty to do so. He did not in his correspondence or otherwise place any limitation on the persons among whom the manuscript might be circulated. Later Mrs. Oettinger wrote White asking permission to charge persons the cost of reproduction. Permission was granted.[2] Mrs. Oettinger saw White on only two occasions. On the one occasion when the Gaelic manuscript was discussed, White told her that he had no objection to additional copies being made, and no limitations were placed on the amount to be charged nor to whom the manuscript was to be sold. It is clear that Mrs. Oettinger told White she wanted to distribute copies to some of her friends. It was understood that the charge was to cover the cost of materials. Mrs. Oettinger ran off three mimeographed sets of the manuscript, averaging about forty copies apiece.[3] The first two sets were sold for $2.00 per copy and the last for $1.50. This witness testified that as time went on she sent copies to persons who were strangers to her, who said they had seen the manuscript somewhere and wanted a copy. These people were apparently strangers to White, also. Most of the people to whom she sold were referred to her by White or by appellee as a source from which copies could be obtained.

A Mrs. Jones testified to having purchased several copies of the manuscript from Mrs. Oettinger through correspondence, and to having paid for them. No restriction or limitation was placed on the use she could make of them. She sent the volumes to people who had asked her for them.

The defendant testified on her own behalf, as did also two other persons, namely a Mrs. Duce and a Mr. Stevens.[4] The testimony of the latter two related to a time apparently not earlier than 1943. These three persons all said, in substance, that while they were given permission to reproduce or to distribute mimeographed copies of the Gaelic manuscript, they were cautioned by White to use extreme care not only as regards the persons given copies but also as regards the persons permitted even to see a copy. Their testimony, however, related entirely to their own activities and their own relations with White. None of it purported to have any bearing on the Oettinger publication or on the publication of the author himself.

White clearly did not wish to publish Gaelic as a conventionally printed book. Several reasons said to have been given by him are testified to—his wife's work in the field was more important and should have precedence; the work was not in proper form for a book; the "Invisibles" had instructed him not to print it.

■ The trial judge's opinion contains a comprehensive and concededly accurate survey of the judicial precedents relating to limited publication, and there would seem to be no justification for our duplicating his efforts in that direction. We adopt as a fair summary of the applicable principle his statement that a limited publication which communicates the contents of a manuscript to a definitely selected group

---

2. There is a letter in the record written in 1940 by White to the defendant, which contains the following passage: "Just a hasty note, before you do any work copying Gaelic. Yesterday afternoon some people were here from Palo Alto who are so stuck on Gaelic that they want to copy it in mimeograph. They asked (a) whether I was willing; (b) if so, would I mind their pass-[ing] it around among such of their friends who want copies,

(c) if so, again, whether I would mind their charging such people the exact cost. I approved. So, if you write them, you might get one of those copies. Name: Mrs. Frank Oettinger, RFD #I, Menlo Park, Cal."

3. These copies were substantially bound with flexible paper covers.

4. The witnesses Duce, Stevens, Jones, and Oettinger testified by deposition.

and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale, is considered a "limited publication," which does not result in loss of the author's common-law right to his manuscript; but that the circulation must be restricted both as to persons and purpose, or it can not be called a private or limited publication. The respect in which we are constrained to disagree with the judge is in the application of the stated legal principles to the facts of the case.

It appears to us that the court disregarded in large part vital and uncontradicted testimony, notably that of White's secretary and of Mrs. Oettinger. No mention is made of White's letter of transmittal, testified to by the secretary, which suggested unqualifiedly that the recipients of the copies of the manuscript pass it on to "others." Who these others might be, or what their philosophy, would necessarily be matters completely unknown to White. As to Oettinger, it seems to be implied by the court that actually she was permitted only to make copies under a strict limitation, whereas her testimony is unequivocal that no limitation was put on the number of copies she might turn out, and none on the persons to whom they would go.[5] Eloquent of her freedom from restrictions is her testimony that on one occasion she sent a copy to a person who had seen a copy in a dentist's office and had written asking her for one. Her evidence conclusively indicates that some of the people to whom she sent copies were not friends or even acquaintances of White, of appellee, or of Mrs. Oettinger herself. Thus it can not be said, on the basis of this phase of the showing, that only friends of White, or "kindred spirits," got or were intended to get copies. Nobody seeking the mimeographed manuscript appears to have been asked for any sort of credentials. In a word, we are unable to see in this picture any definitely selected individuals or any

limited, ascertained group or class to whom the communication was restricted.

Nor is it thought that the case is comparable to those involving publication of lecture notes, or the distribution of copies of a minister's sermon among the members of his congregation, or kindred cases relied on below. It is by such assimilation that the trial court endeavors to satisfy the criterion of the distribution being limited to a specific purpose. But White does not appear in the record as a teacher or as a propagandist endeavoring to persuade. He is not pictured as a man with a message. His only apparent purpose was to enable any persons interested to obtain a copy of the manuscript. No other motive is discernible. Such a purpose, we think, is too broadly general and indefinite to satisfy the test of a limited publication. Obviously only those interested or curious would take the trouble to ask for a copy, and a mere request seems to have been all that was necessary to obtain one.

The court stresses what it found to be White's intent not to publish generally, citing especially the statement in his letter to Mrs. Oettinger, reproduced in note 5 above, namely, that he had no objection whatever to the distribution of copies "provided, of course, it is not in published form." In the context of the case the phrase "in published form" could only mean in book form; and it is in that sense that White must have expected the recipient of the letter to understand it. White was of course quite familiar with the mimeographed distribution. One must in any event look at what he intended to do rather than at what he intended to be the legal consequence of his acts.

Another indication of the limited nature of the publication was thought below to be evidenced by the fact that not more than seventy-five copies were distributed. However, the record clearly shows that at least as many as two hundred copies were put in

5. A letter written by White to Mrs. Oettinger in 1945 is in the record, containing the following passage: "As to the Gaelic, Sue Kimmell is quite right in saying that you may go ahead at your discretion with more copies of it. And your friend, Barbara Delkin, got the wrong impression. I have no objection whatever to the distribution of copies of Gaelic, provided, of course, it is not in published form."

unrestricted circulation over the long period between 1933 and 1946. Through how many hands they passed among the members of the general public can only be surmised.

Judgment reversed.