AMERICAN VITAGRAPH, INC. a Corporation, Lloyd V. Friedgen, Jr., and William J. Gleason, Plaintiffs-Appellees,

v.

Ronald R. LEVY, M.D. and Cinamco, Inc., a Corporation, Defendants-Appellants.

No. 79–3555.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 2, 1981.

Decided Oct. 23, 1981.

O. R. Rouse, Palos Verdes Estate, Cal., for defendants-appellants.

Keith D. Beecher, Jessup & Beecher, Los Angeles, Cal., for plaintiffs-appellees.

Before ELY and ALARCON, Circuit Judges, and TEMPLAR,* District Judge.

ELY, Circuit Judge:

This is an appeal from a declaratory judgment action, 28 U.S.C. §§ 2201, 2202, involving copyright questions under the 1909 Copyright Act, as amended,[1] 17 U.S.C. §§ 10, 26. Jurisdiction rests under 28 U.S.C. § 1338(a), giving federal courts original jurisdiction of civil actions arising under an Act of Congress relating to copyrights.

---

* The Honorable George Templar, United States District Judge, District of Kansas, sitting by designation.

1. Under the Copyright Act of 1976, 17 U.S.C. § 101–810, common law copyright is abolished. The Act does not affect rights with respect to causes of action that arose before January 1, 1978, however. 17 U.S.C. §§ 301(a), (b)(2).

This appeal raises important questions concerning what constitutes "publication" of a motion picture under the 1909 Act. Plaintiff-appellee Vitagraph[2] successfully contended below that copyright protection to the film "Hooray for Hollywood" had been destroyed by acts of divestive publication prior to the film's general release in 1976. We reverse, holding that the alleged divestive acts were not publications and that the film never lost its common law copyright until its publication by general release in 1976. At that time statutory copyright was obtained by publication in compliance with the requisite notice formalities. Accordingly, the film never lost copyright protection, and Vitagraph's contractual claim for damages based on a loss of its security interest is without merit.

## FACTS

### I. The Sale-Purchase Agreement

An understanding of the contractual relationship entered into between Vitagraph and Levy is necessary to understand Vitagraph's asserted claim.[3] In August of 1975 Vitagraph and Levy entered into a written agreement for the sale of the film to Levy. Part of the consideration received was a non-recourse promissory note to be paid from net income of the film under a percentage points profit allocation arrangement. Vitagraph retained a security interest in the film to secure payment of the note, and in the event of default Vitagraph's sole remedy was to look to the film pledged as security. Under the terms of

the agreement, title to the film would also revest in Vitagraph in eight years in the event the note was not paid. Levy obtained all distribution rights to the film, and an assignment of all rights, title, and interest, including copyright, was executed on February 11, 1976.

### II. Vitagraph's Asserted Claim

Vitagraph's theory of recovery below and on appeal is that statutory copyright was obtained in its name and subsequently lost when Levy, following the assignment of the film, caused several alleged publications without proper copyright notice. Damages were determined to be those resulting from the loss of value to Vitagraph's security interest in the film occasioned by the injection of the film into the public domain.

## DISCUSSION

### I. The District Court Reasoning

Vitagraph successfully argued below that statutory copyright was obtained in its name by three separate acts. In December of 1975 Vitagraph delivered to Levy a print of their initial version of the film, which bore copyright notice reading "(c) Copyright American Vitagraph, Inc. 1975". That print was screened to the public for one week in late December 1975 in Eureka, California, and subsequently returned to Vitagraph for additional editing. The District Court held that the Eureka screening constituted an investive publication under 17 U.S.C. §§ 10, 26.[4] The effects of finding

---

**2.** Vitagraph is the wholly-owned corporation of appellees Friedgen and Gleason, the producers of the film. For ease of discussion, we will refer to plaintiffs-appellees as Vitagraph. Cinamco, Inc. is the wholly-owned corporation of appellant Levy. Levy, Friedgen and Gleason had individually entered into a sale-purchase agreement respecting the film and subsequently assigned all rights and interests in the film to their respective shell corporations.

**3.** Most cases raising publication issues arise in the context of infringement suits in which a plaintiff is attempting to show sufficient publication securing statutory copyright so as to bring suit under the federal copyright laws, or where a defendant is interposing as an affirma-

tive defense that the allegedly infringed work is in the public domain due to general publication not in compliance with copyright statute formalities. The situation here, where Vitagraph has retained an interest in the film but is seeking to declare the copyright extinct is highly unusual.

**4.** 17 U.S.C. § 10 provides that:
"Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title; and such notice shall be affixed to each copy thereof published or offered for sale in the U.S. by authority of the copyright proprietor . . . ."
17 U.S.C. § 26 provides that:

an investive publication are the loss of common law copyright, *Wheaton v. Peters*, 33 U.S. (8 Peters) 591, 8 L.Ed. 1055 (1834); *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 347, 28 S.Ct. 722, 725, 52 L.Ed. 1086 (1908); and a resulting limited duration of the statutory copyright being measured from the date of first publication. 17 U.S.C. § 26.

■■■ The District Court also ruled that the subsequent assignments of the film from Vitagraph to Levy and from Levy to Cinamco, which bore copyright notice in Vitagraph's name, constituted investive publications securing statutory copyright. This conclusion is without legal support. Assignment *per se* is not a publication. If the "work" assigned has not been published and is therefore protected by common law copyright, the assignee becomes the proprietor of the copyright. Copyright notice at the time of first publication is then required to be in the assignee's name. *Dave Grossman Designs, Inc. v. Bortin*, 347 F.Supp. 1150, 1156 (N.D.Ill.1972); 3 *Nimmer on Copyright* § 10.07(D)(2)(a) (1978) (hereinafter Nimmer). Conversely, if the "work" assigned has statutory copyright, copyright notice affixed to subsequent publications is required to be in the name of the assignor, unless a recordation of the assignment has been made. 17 U.S.C. § 32 (1909 Act); *Group Publishers v. Winchell*, 86 F.Supp. 573, 576 (S.D.N.Y.1949); *Carter v. Hawaii Transp. Co.*, 201 F.Supp. 301, 305 (D.C.Haw. 1961); 3 Nimmer § 10.07(D)(2)(b).

■■ Therefore, the finding of statutory copyright in Vitagraph's name rests solely upon the one week screening in Eureka, California. That finding is critical to the outcome of this case. Statutory copyright is destroyed and injects a work into the public domain if it is thereafter published with a defective copyright notice. *National Comics Publications, Inc. v. Fawcett Publi-*

*cations, Inc.*, 191 F.2d 594, 599 (2d Cir. 1951); 1 Nimmer § 4.01(B), 2 Nimmer § 7.14.

The District Court held, *inter alia*, that the general release of the film in 1976 bearing copyright notice in Cinamco's name injected the film into the public domain because no recordation of copyright assignment had been made. *Group Publishers v. Winchell, supra.* If statutory copyright in Vitagraph's name was obtained, the general release in Cinamco's name would divest the film of its copyright.

The District Court also found that several prerelease screenings of the film to the trade were publications requiring compliance with statutory formalities. These screenings, if deemed publications, would result in loss of copyright protection in the film if notice was required to be in Vitagraph's name. As discussed *infra*, these pregeneral release screenings were not acts of general publication, and thus did not divest the film of its copyright.

We disagree with the District Court that the Eureka exhibition was a publication forfeiting common law copyright protection and creating a statutory copyright in favor of Vitagraph. We also disagree that *any* publication requiring compliance with statutory formalities occurred prior to the film's general release in 1976. We well recognize that the concept of publication under the 1909 Act, especially as it relates to motion pictures, is an arcane and unsettled area of law. Nevertheless, a few well established principles guide our decision here.

■■■ Publication, while of immense importance under the 1909 Act, is not statutorily defined. Case law has created a distinction between general and limited publication, holding that only the former oper-

"In the interpretation and construction of this title 'the date of publication' shall in the case of a work of which copies are reproduced for sale or distribution be held to be the earliest date when copies of the first authorized edition were placed on sale, sold, or publicly distributed by the proprietor of the copyright or under his authority . . . ."

Section 26 has long been held to only define the *date* of publication and not publication itself. *Cardinal Film Corp. v. Beck*, 248 F. 368 (S.D.N.Y.1918); *Hirshon v. United Artists Corp.*, 243 F.2d 640 (D.C.Cir.1957); 1 Nimmer § 4.04.

ates to divest common law copyright and subject a work to the federal statutory scheme. General publication has been stated to be "such a dissemination of the work of art itself among the public, as to justify the belief that it took place with the intention of rendering such work common property." *American Tobacco Co. v. Werckmeister*, 207 U.S. 284, 299–300, 28 S.Ct. 72, 77, 52 L.Ed. 208 (1907) (*quoting Slater on the Law of Copyright and Trademark* at 92). An oft quoted modern definition of general publication is that "publication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public, or when an authorized offer is made to dispose of the work in any such manner even if a sale or other such disposition does not in fact occur." 1 Nimmer § 4.04 at 4-18—4-19. A limited publication

> "communicates the contents of a (work) ... to a definitely selected group and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale ... (and) does not result in loss of the author's common-law right to his (work) .... [T]he circulation must be restricted both as to persons and purpose, or it can not be called a private or limited publication."

*White v. Kimmell*, 193 F.2d 744, 746–47 (9th Cir. 1952). The restrictions can be implied as well as express. *Burke v. National Broadcasting Co., Inc.*, 598 F.2d 688, 692 (1st Cir. 1979); *Werckmeister v. American Lithograph Co.*, 134 F. 321, 324 (2d Cir. 1904).

■ The courts have treated these two concepts of publication so as to mitigate the harsh forfeiture effects of an improper publication. "From the results of the decided cases, the principle is discernible that it takes more publication to destroy a common-law copyright than to perfect a statutory copyright." *Hirshon v. United Artists Corp.*, 243 F.2d 640, 644–45 (D.C.Cir.1957); *see also American Visuals Corp. v. Holland*, 239 F.2d 740 (2d Cir. 1956). "[I]t takes more in the way of publication to invalidate *any* copyright, whether statutory or com-

mon law, than to validate it." *Hirshon, supra* at 645. Vitagraph's theory of recovery hinges on an invalidation of the copyright. The significance of *American Visuals* and *Hirshon* lies in the recognition that publication may more readily be found if the issue is whether the copyright statute has been complied with than if forfeiture of common law rights is involved.

■ The case law has also drawn a distinction between performance of a work and other means of dissemination. It has long been held that mere performance or exhibition of a work does not constitute a publication of that work. *Ferris v. Frohman*, 223 U.S. 424, 435–36, 32 S.Ct. 263, 266, 56 L.Ed. 492 (1912); *American Tobacco*, 207 U.S. at 300, 28 S.Ct. at 77. Under this principle, a motion picture exhibition where the viewing audience is merely permitted to see the work is not a publication. *Burke*, 598 F.2d at 691, 693; *Patterson v. Century Productions, Inc.*, 93 F.2d 489, 492 (2d Cir. 1937), *cert. denied*, 303 U.S. 655, 58 S.Ct. 759, 82 L.Ed. 1114 (1938); *DeMille Co. v. Casey*, 121 Misc. 78, 201 N.Y.S. 20 (Sup.Ct. 1923); *see* 1 Nimmer § 4.11(A); Nolan, *Copyright Protection for Motion Pictures: Limited or Perpetual?*, 18 ASCAP Copyr. Law Symposium 174, 181 (1970) (hereinafter Nolan); Sussman, *Copyright Publication, The Motion Picture Distributer and the Copyright Revision Bill*, 15 Bull.Copyr. Soc'y 373 (Aug. 1968).

■ We now turn to apply these principles to the several screenings here. The Eureka screening, found to support a statutory copyright in Vitagraph's name, was not a publication divesting the work of its common law copyright. That one week screening, following which the film was returned for reediting, was a limited screening to gauge audience reaction to the film. The movie was not distributed at this time to any other exhibitor nor were any copies of the film sold. In addition, the film that was utilized was not the permanent type of film print that is used when a movie is released for general distribution. The copyright notice attached to the film was a

public expression that the exhibition was intended to be limited or restricted. The film was not being commercially exploited, although a small admission fee was charged.

Commentators and the case law suggest that under these circumstances an investive publication did not occur. Nimmer states that based on the "principle that performance is not a publication, it is clear that the projection or exhibition of a motion picture in theatres or elsewhere does not in itself constitute a publication." 1 Nimmer § 4.11(A) at 4–53. Nolan similarly relies on the performance/publication distinction in stating that "presumably, therefore, the screening of a motion picture either in a public motion picture theatre or over television would not invest statutory protection." Nolan, *supra* at 181.

Both authors express the view we adopt that *motion picture publication occurs when prints of a film are made available under a lease or similar arrangement to theatre operators for public exhibition.* 1 Nimmer § 4.11(A); Nolan, *supra* at 182. The case law, however, supporting this proposition is scant and not directly on point.

In *Patterson v. Century Productions* copies of a film were widely exhibited, though without charge. The Court there stated that the film was not published:

This motion picture was not distributed except for exhibition in the strictly limited noncommercial way above described. As the distribution was limited to exhibitions of the picture without charge, no one was given the right to use the copies ... for any other purpose whatsoever .... There was, therefore, no publication ....

*Patterson*, 93 F.2d at 492.

Professor Nimmer expresses what he states to be the prevailing motion picture industry view of this case: "It would seem that the proper inference to be drawn from this case is that where distribution of a film is made on an unrestricted and commercial basis such distribution constitutes a general publication." 1 Nimmer § 4.11(A). The

current Act, 17 U.S.C. § 101, makes clear that "offering to distribute copies" of motion pictures "to a group of persons for purposes of ... public performance ... constitutes publication." H. Report on Copyright Act of 1976, p. 138. We agree with Professor Nimmer that this definition is a codification of the unstated definition of motion picture publication under the 1909 Act.

Only one case, however, lends clear support to this view. In *Blanc v. Lantz*, 83 U.S.P.Q. 137 (Cal.Super.1949), the plaintiff sought damages for the alleged infringement of his common law rights to a musical laugh on the soundtracks of Woody Woodpecker cartoon films. The court there held that the "distribution and exhibition in commercial theatres throughout the world ... constitutes so general a publication of the contents of the film and its soundtrack as to result in the loss of common law copyright." *Id.* at 142.

Though we thus hold that the film was protected by common law copyright at the time of its assignment to Levy and Cinamco, we must further determine if any of the pre-release screenings to the trade amounted to general publication prior to the film's general release. If Cinamco, as assignee and therefore proprietor of the copyright, caused a publication without proper notice, copyright protection in the film would be destroyed. *Walker v. University Books, Inc.*, 602 F.2d 859, 863 (9th Cir. 1979); 2 Nimmer § 7.03.

This Court finds that no acts of divestive publication took place. The screenings to the trade were apparently for the limited purpose of generating interest in the film among potential film distributors. There was only one print of the film extant, which copy was not sold to the distributors who viewed the film at the screenings for further distribution. The screenings were to a select group and for a limited purpose, to foster interest in the film. *White v. Kimmel*, 193 F.2d at 746–47. Thus, even if copyright notice was defective, such defects do not trigger copyright

divestment if, as here, there is no publication. *Heim v. Universal Pictures Co.*, 154 F.2d 480, 487 (2d Cir. 1946).

The District Court's additional reason supporting its conclusion that copyright protection was destroyed was that the general release bearing the copyright notice "(c) Cinamco 1976", although no recording of any assignment has been made in the Copyright Office, in and of itself placed the motion picture in the public domain. This conclusion is wrong as a matter of law. Cinamco, as assignee of the common law copyright, was required to, and properly did, use its name in the copyright notice at the time of publication. *See Dave Grossman Designs, Inc. v. Bortin*, 347 F.Supp. 1150, 1156 (N.D.Ill.1972); 3 Nimmer § 10.-07(D)(2)(a). Statutory copyright was then properly secured at the point of the film's general release. Consequently, Vitagraph's security interest in the film is unimpaired and its claim for damages is without merit.

In sum, we hold that, in the context where a forfeiture of copyright protection is at stake, that publication of a motion picture does not occur until the film is in commercial distribution—when copies of a film are placed in the regional exchanges for distribution to theatre operators. The adoption of this rule, generally advocated by commentators and followed by the film industry, is in accord with the underlying policies of the copyright law, and at the same time removes much uncertainty from a difficult and arcane area of copyright law under the 1909 Act.

The judgment below is

REVERSED.