**H. Jackson BROWN, Jr., Plaintiff-Appellant,**

v.

**Bob TABB and Bob Tabb Cadillac, Inc., Defendants-Appellees.**

**No. 82–7144.**

United States Court of Appeals, Eleventh Circuit.

Sept. 16, 1983.

Goodpasture, Carpenter, Woods, Speight & Parker, Richard D. Speight, Nashville, Tenn., for plaintiff-appellant.

Hornsby, Blankenship, Smith & Robinson, David H. Meginniss, Ralph W. Hornsby, Huntsville, Ala., Stewart, Estes & Donnell, Philip M. Kirkpatrick, Nashville, Tenn., for defendants-appellees.

Before TJOFLAT, HILL and JOHNSON, Circuit Judges.

TJOFLAT, Circuit Judge:

H. Jackson Brown, Jr., appeals from the district court's grant of summary judgment in favor of defendants Bob Tabb and Bob Tabb Cadillac, Inc. on his claim for copyright infringement under the Copyright Act of 1976 (the Act), 17 U.S.C. §§ 101–810 (Supp. V 1981). The district court held that Brown was entitled to no protection under the Act because the subject matter of the claimed infringement, a musical composition entitled "He Traded My Way," had entered the public domain prior to January 1, 1978, the effective date of the Act. The Act provides no "copyright protection for any work that [went] into the public domain before January 1, 1978." Pub.L. No. 94–553, § 103, 90 Stat. 2599 (1976). The court held that the composition entered the public domain before the relevant date because it had been "published" before that date. Brown's only argument on appeal is that the district court erred in holding that a general, as opposed to a limited, publication had occurred. We reject this argument

and affirm the judgment of the district court.

## I.

H. Jackson Brown, Jr., a resident of Nashville, Tennessee, is a "creative person" in the advertising business—a person who creates material for advertising clients. In 1971 Brown composed the jingle "He Traded My Way" while he was developing an advertising package for Don Jacobs Oldsmobile in Lexington, Kentucky. Brown recorded the jingle on multi-track tape, with the lyrics containing the name Don Jacobs. By using multi-track tape, the vocal track could be re-recorded substituting the name of a different automobile dealer without the necessity of recording a new instrumental track. Brown retained possession of the master multi-track tape. He delivered to Don Jacobs Oldsmobile a reel-to-reel tape of the jingle. Unlike the multi-track tape, the instrumental and vocal parts on this tape were mixed together; another dealer's name could not be substituted without re-recording both the music and the lyrics. Brown does not contend that there was any express agreement with the dealership restricting the use of the tape.

Brown sold a second similar customized tape to Bill Trickett Oldsmobile in Nashville in 1974 or 1975. The lyrics on this tape contained the name Bill Trickett. There was no evidence suggesting any express restriction on the dealership's use of the tape.

In 1974 Brown sold a third tape to Chuck Hutton Chevrolet. Again, the jingle was customized, containing the name Chuck Hutton. Bob Tabb, the individual defendant in this case, was general manager of Chuck Hutton Chevrolet at the time. He was responsible for the dealership's advertising and he handled the transaction for the dealership. There was no evidence of any express restriction on the dealership's use of the tape.

Bob Tabb left his position with Chuck Hutton Chevrolet at the end of 1974 and purchased an automobile dealership in Huntsville, Alabama. He began operating this dealership in early 1975 as Bob Tabb Cadillac, the corporate defendant in this case. Tabb subsequently contacted Chuck Hutton and borrowed from him the tape containing the jingle customized with Hutton's name. Tabb had the jingle completely re-recorded—that is, both the words and music were re-recorded—with the name Bob Tabb substituted. The Tabb dealership has used the jingle many times since 1975 in both radio and television advertising in Huntsville.

Brown did not learn of Tabb's use of the jingle until the spring of 1979 when an Alabama client mentioned having heard the jingle in a Huntsville television commercial. Brown applied for registration of a copyright in the work and obtained a certificate of registration bearing an effective date of April 25, 1980, and indicating that the work was first published on June 24, 1971. Brown's requests for compensation from Tabb were of no avail; hence, this suit was filed on September 25, 1980.

## II.

As stated, Brown claims protection of his jingle only under the Copyright Act of 1976, which provides no protection for any work that became part of the public domain prior to January 1, 1978. Whether the work was part of the public domain prior to that date depends on whether either a common law copyright or a statutory copyright under the Copyright Act of 1909, Act of March 4, 1909, ch. 320, 35 Stat. 1075, existed in the work as of January 1, 1978. If the work was unprotected under both of these protections as of that date, it was in the public domain, and thus not protected under the 1976 Act. *See* 1 Nimmer On Copyright § 4.01[B], at 5–6 (1983) (hereinafter cited as Nimmer). Brown claims no protection under the 1909 Act. Thus, the question presented is whether the work had common law copyright protection as of January 1, 1978. This protection did not exist if a divesting publication occurred prior to that date. *Id.*

■ Obviously, the determination whether a work entered the public domain prior to the effective date of the 1976 Act must be made according to the copyright law as it existed before that date. *Data Cash Systems, Inc. v. JS & A Group, Inc.,* 628 F.2d 1038, 1042 (7th Cir.1980). The definition of "publication" that evolved by case law before the effective date of the 1976 Act indicated that

> publication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public, or when an authorized offer is made to dispose of the work in any such manner even if a sale or other such disposition does not in fact occur.

1 Nimmer § 4.04, at 19 (footnotes and emphasis omitted); *see American Vitagraph, Inc. v. Levy,* 659 F.2d 1023, 1027 (9th Cir. 1981); *Testa v. Janssen,* 492 F.Supp. 198 (W.D.Pa.1980). To lessen the sometimes harsh effect of the rule that publication destroyed common law rights, however, courts developed a distinction between a "general publication" and a "limited publication." *See American Vitagraph,* 659 F.2d at 1026–27. *See generally* 1 Nimmer § 4.13[A]. Only a general publication divested a common law copyright. *See American Vitagraph,* 659 F.2d at 1026–27; *Burke v. National Broadcasting Co.,* 598 F.2d 688, 691 (1st Cir.1979), *cert. denied,* 444 U.S. 869, 100 S.Ct. 144, 62 L.Ed.2d 93 (1979). A general publication occurred when a work was made available to members of the public at large without regard to their identity or what they intended to do with the work. *Burke,* 598 F.2d at 691. Conversely, a non-divesting limited publication was a publication that

> communicates the contents of a [work] to a definitely selected group and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale .... [T]he circulation must be restricted both as to persons and purpose, or it can not be called a private or limited publication.

*White v. Kimmell,* 193 F.2d 744, 746–47 (9th Cir.1952), *cert. denied,* 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952); *see American Vitagraph,* 659 F.2d at 1026–27; *Data Cash Systems,* 628 F.2d at 1042; *Burke,* 598 F.2d at 692.

■ Brown concedes that some type of publication occurred prior to 1978, but argues that such publication was a limited one. We disagree. We believe that the publication involved in this case was limited neither in purpose nor to a definitely selected group. Concerning limitation on purpose, Brown argues that the circumstances of the distribution, most notably his deliverance of customized versions of the jingle to various dealers, indicate an implied restriction on the dealers' reproducing, distributing, or selling the jingle. The district court accepted this contention for purposes of summary judgment, and we need not reject it. We note, however, that under the *White* test the requirement that there be no right of sale or distribution is separate from and in addition to the requirement that there be a limited purpose. Although there may be no right of sale, the limited purpose prong of the test still may not be met. Therefore, for purposes of this opinion, we accept Brown's contention that there was an implied limitation on the sale or distribution of the work. Nevertheless, it is undisputed that each dealer was completely free to use the jingle for his own commercial benefit, and to broadcast the work as broadly as he wished. In these circumstances, we do not think the "limited purpose" prong of the *White* test is applicable. *Cf. American Vitagraph,* 659 F.2d at 1028–1029 (motion picture publication occurs when prints are made available on a commercial basis to theatre operators for public exhibition).

■ Furthermore, as the district court found, Brown plainly did not limit distribution of the jingle to a select group. The number of persons receiving copies is not determinative; a general publication may be found when only one copy of the work reaches a member of the general public because general publication depends on the author making the work available to those

interested and not on the number of persons who actually express an interest. *Burke,* 598 F.2d at 691. Even if the persons receiving copies in fact constitute only a select group, the publication is nevertheless general if copies were available to persons not included in the group. 1 Nimmer § 4.13[A]; *see Continental Casualty Co. v. Beardsley,* 253 F.2d 702, 707 (2d Cir.1958) (finding a general publication where "[t]he only limitation was that attributable to a lack of general interest in the highly specialized subject-matter").

The evidence in this case indicates that the jingle was available to any automobile dealer doing business in a market not yet exposed to the jingle who would pay the price. Brown sold the jingle to such dealers who wished to acquire it; there is absolutely no evidence any potential purchaser was ever turned away. The three dealers acquiring the jingle before 1978 did not constitute a select group because the jingle was available to others. Nor would it be reasonable to say that the select group consisted of all automobile dealers or dealers in markets where the jingle was not already in use. The limited publication doctrine is plainly more narrowly drawn.

Unfortunately, Brown relied on the fact that the tapes he provided to the dealers were customized, and thus the name of a new dealer could not be substituted unless the entire tape was re-recorded. Obviously, he did not think it likely that a dealer would re-record without obtaining his permission. Brown's belief that such a re-recording would not occur is, however, an insufficient basis to afford the work copyright protection. "[D]edication is a question of law, not the intent of the proprietor." *Data Cash Systems,* 628 F.2d at 1043 (holding that plaintiff's erroneous belief that a Read-Only-Memory chip in a computer game could not be copied was insufficient to establish copyright protection).

The result of this case is consistent with the rationale for the rule that publication divests common law rights. Professor Nimmer notes that the limited monopoly concept of federal law represents an attempt to strike a balance between the interest of authors in the fruits of their labors and the interest of the public in claiming access to material. 1 Nimmer § 4.03. With that balance in mind, he explains the rule that publication divests common law rights as follows:

> The common law copyright grants of rights in perpetuity clearly conflicted with the aforesaid limited monopoly policy. Prior to enactment of the current Copyright Act (when the duration of protection even for unpublished works became limited in time), it was thought that so long as a work remained unpublished the author's right to the privacy of his manuscript could properly prevail over the public's right of access, and consequently common law copyright in unpublished works might endure in perpetuity. However, once an author elected to forego the privacy of his manuscript, preferring the more worldly rewards that come with exploitation of his work, he had to accept the limitations on his monopoly imposed by the public interest. Consequently, at such time perpetual common law rights ceased, and the author was required to look to the federal statute for the limited form of monopoly there available.

1 Nimmer § 4.03, at 15–16 (footnotes omitted). Brown, as shown by the sale of tapes for a price, preferred "the more worldly rewards that come with exploitation of his work." Therefore, the result of this case is consistent with the rationale of the doctrine that publication divests common law rights.

AFFIRMED.