**ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, a California nonprofit corporation, Plaintiff,**

v.

**CREATIVE HOUSE PROMOTIONS, INC., a Delaware corporation, Defendant.**

**No. CV 88–00406–LEW.**

United States District Court, C.D. California.

Nov. 6, 1989.

Quinn & Emanuel, David W. Quinto and Cynthia L. Zedalis, Los Angeles, Cal., for plaintiff.

Halstead, Baker & Olson, Eric Olsen and William C. Hansen, Los Angeles, Cal., for defendant.

## MEMORANDUM OF DECISION

LAUGHLIN E. WATERS, Senior District Judge.

This case came on for trial before the Honorable Laughlin E. Waters, Senior United States District Judge, on March 14, 1989. John Quinn, David W. Quinto, and Cynthia L. Zedalis appeared on behalf of the plaintiff; Eric Olsen and Irving Faber appeared on behalf of the defendant.

### Facts

Plaintiff Academy of Motion Picture Arts and Sciences (the "Academy") brought this action against Creative House Promotions ("Creative House") for copyright infringement, false designation of origin under the Lanham Act, unfair competition, and trademark dilution concerning its rights in the "Oscar" statuette.

The Academy was founded in 1927 by a group of film industry leaders. The purpose of the Academy is to advance and promote the motion picture arts and sciences and cultural, educational, and technological progress. Since 1929, the Academy has annually conferred Awards of Merit, known to the public as "Oscars." Winners are given copies of the Oscar statuette (the "Oscar"). Awards of the Oscar are made during the Academy Awards ceremony, which has been televised annually since 1953. The ceremony is now televised live to approximately 80 million persons in the United States, and on a live or delayed basis to over 80 countries. Since 1929, thousands of photographs of the Oscar have appeared in newspapers, magazines, newsreels, encyclopedias, and books relating to Hollywood or the motion picture industry.

Prior to 1941, the Academy claimed common law copyright protection in the Oscar as an unpublished work of art. At that time, it did not bear the statutory copyright notice, which was only required for "published" works under the Copyright Act of 1909, Act of March 4, 1909, ch. 320, 35 Stat. 1075. From 1929 through 1941, 158 Oscars were given to Award of Merit winners. Recipients were not required to be Academy members and, until 1941, no written requirements were placed on the uses to which the recipients could put the Oscars.

In 1941, the Academy registered the Oscar with the Copyright Office of the United States as an unpublished work of art. Also in 1941—or sometime thereafter, the record is not clear—the Academy prohibited recipients from selling or otherwise dis-

posing of the Oscar without first offering to sell it back to the Academy. The Academy also placed limited restrictions on the manner in which a recipient could advertise the Oscar. Essentially, the recipient was required to identify the year and achievement for which he or she won the award.

In 1950, the estate of Sid Grauman auctioned his personal effects, including an Oscar he had received post-mortem in 1948. A representative of the Academy offered the highest bid and purchased it on behalf of the Academy.

In 1976, the president of Creative House, a manufacturer and distributor of advertising specialty items, asked a professional trophy sculptor to design a striking figure holding a star in its hand. The result was a streamlined, abstract rendering of a naked, muscular male much like the Oscar, only two inches shorter and holding a star instead of a sword. Both the Oscar and the Star Award have a gold finish and are cast in solid metal and stand on a circular gold cap mounted on a cylindrical base. Creative House initially ordered the Star Award for use by a client, an advertising agency, that wished to honor its "star" salespersons. Shortly thereafter, Creative House decided to sell the award to other corporate buyers, but did not direct its marketing and promotion to trophy stores or other outlets directed to the general public. In the Chicago area, Creative House marketed the product directly to corporations by promoting the Star Award incentive program. Under the program, all members of a sales staff would receive a small star at the outset of the program; those reaching a certain level of achievement would receive the star paperweight, and those reaching the highest level of achievement would receive the Star Award. In areas other than Chicago, Creative House marketed its products through advertising specialty distributors. It did so by advertising the award in Impact Advertising Catalog—Advertising Specialties & Business Gifts, a catalog of approximately 132 pages published semiannually by an independent party. The catalogs were sold to advertising specialty distributors who distributed them in the course of their business to their retail customers. Additionally, Creative House distributed single page advertisements, referred to as "cut sheets," featuring the Star Award to distributors who would then promote the product to their customers. Advertising specialty distributors could also find out about Creative House and its products by contacting the Ad Specialty Institute, an organization serving the advertising specialty business. The institute provided members information upon request as to the sources of various products. Thus, a member inquiring about sources of awards would be referred to Creative House as well as other sources. In each of these ways, distributors were able to locate and sell the Star Award to their retail customers. Those customers who purchased awards were generally corporate buyers who gave them to employees as incentive gifts or to loyal customers as gifts of gratitude.

By letter dated April 30, 1983, the Academy demanded that Creative House discontinue or significantly change the Star Award. After a series of negotiations collapsed, the Academy, on January 25, 1988, filed this action in which it has asserted claims for copyright infringement, false designation of origin under the Lanham Act, unfair competition, and trademark dilution.

### *Discussion*

I. Copyright Infringement

 The Academy claims protection of the Oscar under the Copyright Act of 1976 (the "Act"), 17 U.S.C. sections 101–810 (Supp. V 1981), which provides no protection for any work that became part of the public domain prior to January 1, 1978, the effective date of the Act. *See Brown v. Tabb,* 714 F.2d 1088, 1090 (11th Cir.1983). Whether the work was part of the public domain prior to that date depends on whether a common law copyright existed in the work as of January 1, 1978. At common law the creator of an artistic work has the right to copy and profit from it, and can distribute or show it to a limited class of persons for a limited purpose without los-

ing that right. *See Burke v. National Broadcasting Co., Inc.*, 598 F.2d 688, 691 (1979). The right continues until the creator allows a "general" publication of his work to occur; the work then passes into the public domain and, unless the creator has obtained a statutory copyright, anyone can copy, distribute or sell it for his own benefit. *Caliga v. Inter Ocean Newspaper Co.*, 215 U.S. 182, 188, 30 S.Ct. 38, 39, 54 L.Ed. 150 (1909). Thus, the question presented is whether a divesting publication of the Oscar occurred prior to January 1, 1978.

The common law recognizes three ways of exposing a work to the public: exhibition or performance, limited publication, and general publication. Of these, only general publication results in loss of the common law copyright by the creator. *Burke*, 598 F.2d at 691.

■ At common law, mere performance or exhibition of a work results in no publication. *Ferris v. Frohman*, 223 U.S. 424, 435, 32 S.Ct. 263, 266, 56 L.Ed. 492 (1912). This view has been incorporated in the current Copyright Act, 17 U.S.C. section 101. Thus, the general public did not obtain possession of the Oscar by seeing it presented at the awards ceremonies or by seeing any display of an Oscar.

■ A divesting general publication does occur when a work is made available to members of the general public without regard to who they are or what they propose to do with it. *Burke*, 598 F.2d at 691. Conversely, a non-divesting limited publication is one in which tangible copies of the work are distributed, but to a selected group of persons and for a limited purpose. *Id.* at 692. A much-quoted formulation of limited publication is that it

> communicates the contents of a (work) ... to a definitely selected group and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale.... [T]he circulation must be restricted both as to persons and purpose, or it cannot be called a private or limited publication.

*White v. Kimmell*, 193 F.2d 744, 746–47 (9th Cir.1952). The restriction can be im-

plied as well as express. *Werckmeister v. American Lithographic Co.*, 134 F. 321 (2d Cir.1904).

Conceding that some type of publication occurred prior to 1978, the Academy contends that such publication was limited because Oscars were given to a selected group of individuals for the limited purpose of honoring their achievements.

### A. Selected Group

There is no question that the Academy has awarded the Oscar only to a select group of persons. Not only is the award limited to those in the motion picture industry, but even the vast majority of persons in the motion picture industry, including many distinguished and highly regarded individuals, will never receive one.

### B. Limited Purpose

Even though the Academy distributed copies to a selected group, the publication is considered general "unless there is an express or implied limitation as to the purpose for which such copies may be used by the group. This limitation ordinarily must preclude the recipients of copies from broadcasting, or from producing, distributing or selling such copies." 1 M. Nimmer, *Nimmer On Copyright* section 4.13[A][2] (1983) (hereinafter cited as "Nimmer"). The requirement that there be no right of sale or distribution is separate from and in addition to the requirement that there be a limited purpose. *See Brown*, 714 F.2d at 1091. Thus, each requirement will be examined separately.

#### 1. Limited Purpose Requirement

■ The Academy contends that it has awarded the Oscar only for the limited purpose of honoring the winners' personal achievements. However, there appears to be another unarticulated purpose. Since its founding in 1927, the undisputed purpose of the Academy has been to advance and promote the motion picture arts and sciences. As indicated by the Academy's 1929 Annual Report, the policy of awarding the Oscar was contemplated by the founders as one of the proper functions of the

organization. (Plaintiff's Exhibit 39) One may easily infer, therefore, that from the very beginning, the Academy has annually presented the Oscar not only to honor the recipients, but to promote the film industry. That this has remained a major purpose is evinced by the fact that the Academy spends, in addition to the telecast of its award ceremony, over $800,000 annually to promote the awards program and the Oscar. This conclusion is further supported by the fact that while the Academy, since 1941, has precluded recipients from selling the Oscar, recipients are allowed to advertise the Oscar as long as they comply with minimal identification requirements. Thus, the question presented is whether the totality of purposes underlying the presentation of the Oscar satisfies the limited purpose requirement. To appropriately answer this question, it is important to understand the rationale for the rule that publication divests common law rights.

Professor Nimmer explains the limited monopoly concept of federal law as representing an attempt to strike a balance between the interest of the authors in the fruits of their labors and the interest of the public in claiming access to material. 1 *Nimmer* section 4.03. Professor Nimmer then explains the rule that publication divests common law rights as follows:

> The common law copyright grants of rights in perpetuity clearly conflicted with the aforesaid limited monopoly policy. Prior to enactment of the current Copyright Act (when the duration of protection even for unpublished works became limited in time), it was thought that so long as a work remained unpublished the author's right to the privacy of his manuscript could prevail over the public's right of access, and consequently common law copyright in unpublished works might endure in perpetuity. However, once an author elected to forego the privacy of his manuscript, preferring the more wordly rewards that come with exploitation of his work, he had to accept the limitations on his monopoly imposed by the public interest. Consequently, at such time perpetual common law rights ceased, and the author was required to look to the federal statute for the limited form of monopoly there available.

1 *Nimmer* section 4.03, at 15–16 (footnotes omitted).

Application of the rationale articulated by Professor Nimmer to a case analogous to the case at hand is found in *Brown v. Tabb*, 714 F.2d 1088 (11th Cir.1983). There, Jackson Brown, Jr., composed several customized jingles which he sold to several automobile dealerships without an express agreement restricting their use of the jingle. Bob Tabb, general manager of one of the dealerships, left his position and purchased his own dealership. Tabb borrowed from his former employer the tape containing one of the customized jingles. After learning of Tabb's use, Brown applied for registration of a copyright in the work and obtained a certificate of registration indicating that the work was first published in 1971. After Tabb refused Brown's request for compensation, Brown sued Tabb and his incorporated dealership in 1981 for copyright infringement. Granting summary judgment in favor of the defendants, the district court held that the subject matter entered the public domain prior to January 1, 1978, the effective date of the Copyright Act. In upholding the ruling, the circuit court stated that the "limited purpose" prong of the *White* test was not satisfied because "each dealer was completely free to use the jingle for his own commercial benefit, and to broadcast the work as broadly as he wished." *Id.* at 1091. Additionally, because the plaintiff sold the tapes for a price, he indicated a preference for "the more worldy rewards that come with exploitation of his work." *Id.* at 1092. The court in *Brown* thus concluded that the result was consistent with the Professor Nimmer's rationale for the rule that publication divests common law rights.

The facts of *Brown* can be analogized to the case at hand. As the plaintiff did with his product in *Brown*, the Academy allows recipients to advertise the Oscar for their own commercial benefit. Thus, as in *Brown*, the limited purpose prong is not satisfied. Additionally, as the result in *Brown* was consistent with Professor Nim-

mer's rationale, so it is here because although the Academy has not sold the Oscar, as the plaintiff did in *Brown*, it has spent millions of dollars promoting the Oscar to promote the movie industry. The Academy's promotion of the Oscar and the annual ceremony enables the industry to sell more of its product: movies. Thus, the Academy has exploited the Oscar no less than the plaintiff in *Brown* exploited his jingle. The only difference is that the Academy did so not for its own commercial benefit but for the commercial benefit of the industry it was created to promote. However, this is a distinction without significance because it may be fairly stated that the Academy, founded by film industry leaders, and the film industry share a unity of interest. The Academy's copyright claim must, therefore, fail because the Oscar entered the public domain prior to January 1, 1978.

### 2. No Right of Sale or Distribution Requirement

Because the court has determined that the limited purpose prong of *White* has not been met, the requirement that there be no right of sale or distribution need not be reached. However, it is interesting to note that the author of the history of the Academy explained the pre–1941 period as follows: "In the early years, a winner could hock his Oscar, melt it down, or shoot craps for it if he wanted." R. Osborne, *50 Golden Years of the Oscar, The Official History of the Academy of Motion Arts & Sciences* 63 (1969). Mr. Osborne has since submitted a declaration on behalf of the Academy in which he admits that he does not know of any recipients who did any of the things mentioned. However, the question is not whether the pre–1941 recipients did in some manner dispose of their Oscars, but rather whether they knew that they were restricted from doing so without the benefit of express instructions from the Academy. No evidence was presented to suggest that the Academy should not have reasonably anticipated prior to 1941 that without express instructions a recipient would give or bequeath the Oscar to friends, family or others who might sell or in some other manner dispose of it. The

1950 auction of the Oscar awarded to Sid Grauman is a post–1941 example of what might have happened before 1941 with any of the 158 Oscars awarded.

## II. Trademark Infringement

The Academy contends that Creative House has violated section 43 of the Lanham Act, 15 U.S.C. section 1125(a). This statute precludes the use of another's trademark in a manner likely to confuse the public about the origin of goods. *New West Corp. v. NYM Co. of California*, 595 F.2d 1194, 1201 (9th Cir.1979). Though Academy has never sold Oscars to the public, competitive injury is not required for recovery for false designation of origin. *See Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1136 n. 13 (2d Cir.1982). To support this claim, Academy must prove that a typical buyer of Creative House merchandise would think that the Star Award was produced, sponsored, or endorsed by the Academy. *See International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 920 (9th Cir. 1980).

It is important to note that trademark law is concerned only with identification of the maker, sponsor, or endorser of the product so as to avoid confusing consumers. Trademark law does not prevent a person from copying "functional" features of a product which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product. *Id.* at 917.

The seminal case of *Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir.1952), illustrated the distinction between trademarks and functional features. There, the plaintiff, Wallace China, claimed trademark infringement in the use by others of its china design. Finding no trademark infringement because the design served as a functional part of the product, the court explained the distinction:

> Imitation of the physical details and designs of a competitor's product may be actionable if the particular features imi-

tated are "non-functional" and have acquired a secondary meaning. But, where the features are "functional" there is normally no right to relief. "Functional" in this sense might be said to connote other than a trade-mark purpose. If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden.... Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.

*Id.* at 343 (citation omitted).

■ The parties emphasize different parts of this passage. Creative House asserts that the design of the Oscar is functional because the essential function of a statuette is its particular shape or aesthetic appearance, and the design is an important part of its commercial success. The Academy asserts that the design of the Oscar is arbitrary embellishment adopted for the purposes of individuality. Although the design of a statuette is in some ways functional, as argued by Creative House, this court concludes that the design of the Oscar is primarily arbitrary embellishment adopted for the purposes of individuality. There is no consumer requirement that a trophy look like the Oscar. Trophies can range from the classic "winged victory" trophy, to cups, such as the America's Cup, to abstract art such as the Emmy.[1] Thus, the court concludes that, on balance, the design of the Oscar is non-functional.

■ For the imitation of a design to be actionable, the court in *Pagliero* stated that the particular feature not only had to be non-functional, but had to have acquired

a secondary meaning. There is no question that the Academy has acquired a secondary meaning in the Oscar. It is undisputed that the general public strongly associates the Oscar with the Academy and the Academy Awards. With approximately a billion viewers of the annual awards ceremony, the Oscar may be the most well-known award in the world. *Webster's New Riverside University Dictionary* (1984) defines "Oscar" as "a trademark awarded annually by the Academy of Motion Picture Arts and Sciences for achievement in motion pictures."

Because the court has concluded that the design of the Oscar is non-functional and has acquired a secondary meaning, it may be protected under the Lanham Act. *See Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 772 (9th Cir. 1981). The question, therefore, is whether the Academy's trademark rights in the design have been violated by Creative House's use of the Star Award.

Under the Lanham Act, the ultimate test is whether the the public is likely to be deceived or confused by the similarity of the marks. *New West Corp.*, 595 F.2d at 1201. In determining whether the evidence is sufficient to establish a likelihood of confusion, courts have considered six relevant factors:

(1) similarity in appearance, sound and meaning;

(2) the class of goods or services in question;

(3) the marketing channels and trade areas involved;

(4) the intent of defendant;

(5) the strength or weakness of the mark; and

(6) the evidence of actual confusion.

*J.B. Williams Co., Inc. v. LeConte Cosmetics, Inc.*, 523 F.2d 187, 191 (9th Cir. 1975).

### (1) Similarity in Appearance

Although an expert witness in behalf of Creative House testified as to several min-

---

**1.** The Academy of Television Arts and Sciences annually confers awards of merit, known to the public as "Emmys," for achievement in night-

time television programs. *See The World Almanac And Book of Facts* 31 (1989).

ute dissimilarities, there appear to be only two material distinctions: the Star Award substitutes a star in place of the Oscar's sword, and is two inches shorter than the Oscar. Otherwise, the two works are very similar: both are recreations of an abstract, gold-colored, essentially naked, muscular man standing on a circular, gold-colored cap mounted on a cylindrical base.

### (2) Class of Goods; Marketing Channels

Although the Academy and Creative House distribute similar "goods"—both distribute statuettes—the respective channels of distribution are entirely different. The Academy awards the Oscar at an annual awards ceremony for meritorious movie performances or achievements in the movie industry. Creative House advertises the Star Award either directly to the corporate buyer of incentive plans or in catalogs and "cut sheets" to distributors of advertising specialties who then sell the award to the corporate buyer.

### (3) The Intent of Defendant

Creative House asserts that in promoting the Star Award it has not referred to the Oscar or any supposed resemblance to the Oscar. However, the Academy offered two Star Award advertisements at trial in which Creative House stated that the award "[r]esembles internationally acclaimed award given to the most talented people in the country." (Plaintiff's Exhibits 44, 45) This reference is clearly to the Oscar and evinces an intent on the part of Creative House to make the potential purchaser associate the Star Award with the Oscar. However, association does not necessarily result in confusion. If anything, use of the word "resembles" suggests that the Academy did not produce, sponsor, or endorse the product for it is a term that a competitor might use in comparing his product to a competitor's. Thus, evidence has not been presented indicating that Creative House intended to confuse potential purchasers as to the source of the Star Award.

### (4) Strength of the Mark

A strong mark is entitled to greater protection than a weak mark. *New West Corp.*, 595 F.2d at 1202. Here, the Oscar may be considered a relatively strong mark because it enjoys recognition among many members of our society. However, this factor must be considered in conjunction with the factor of likelihood of confusion as explained in *Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F.Supp. 198, 209–10 (D.Md.1988):

> The extent to which (the owner of a mark) may protect (his) interest relates directly to the strength of his mark. While one mark may not enjoy the strength of identity to preclude use of a junior mark in a related field or neighboring market, another may enjoy such recognition that confusion might result outside his own field or beyond the markets in which he does business. The measurement of this strength is revealed by evidence demonstrating a likelihood of confusion. The relationship of these two factors, strength and confusion, operates such that evidence of strength of a mark is perhaps the most significant factor in predicting the likelihood of confusion. On the other hand, evidence of the likelihood of confusion in a related field or neighboring market or even a competitive market, defines the scope of a mark's enforcement and therefore is the measurement of its strength.

*Id.* at 210 (citations omitted). Thus, to properly determine the strength of the Academy's mark in the Oscar and the scope of its enforcement, the likelihood of confusion must be analyzed.

### (5) Likelihood of Confusion

Appropriate survey evidence is meaningful to establish likelihood of confusion, and at trial the Academy offered such evidence.

Marylander Marketing Research and Litigation Measurements, Inc., conducted the survey in which consumer attitudes were examined in Long Island, Chicago, and Los Angeles. Interviewers in each of the areas were instructed to complete 40 interviews, 60 percent men, 40 percent women. The interviewers were required to ask a series of questions of each person interviewed. The first three questions elicited whether

the person worked full-time, in the private sector, and was a professional white-collar worker. If the person responded in the negative to any of the first three questions, the interviewer was instructed to terminate the interview. In this way, the research firm attempted to limit the universe to white-collar professionals.

If the person being interviewed answered the first three questions satisfactorily, the interviewer was asked to do and read the following in question 4: "I have just a ccuple more questions. (SHOW STATUE) Please look at this statue. As you look at it, what, if anything, comes to mind—what do you think of? (RECORD EXACT COMMENTS)." After being shown the Star Award, 55 percent of the people stated they thought of the Oscar. An additional 10 percent associated the Star Award with the film industry.

If the person being interviewed did not specifically name the Oscar in response to the fourth question, the interviewer was required to ask the fifth and final question: "What name, if any, comes to mind when you look at this statue?" 70 percent of the people so prompted responded that the Oscar came to mind.

The Academy asserts that these figures reflect a high level of likelihood of confusion. However, as mentioned *supra*, a high level of association does not necessarily amount to confusion. It is one thing to say that a use brings the Oscar or the Academy to mind, but without confusion that the Academy is behind the product, and quite another to conclude that an appreciable number of typical consumers are likely to become actually confused. In the former case, there is no trademark violation. Additionally, even though the survey was limited to white collar professionals in the private sector who might very well be similar to Creative House's actual customers, the actual purchaser of the Star Award is presented with it in an entirely different context than that with which the Star Award was presented to those interviewed. For example, the corporate buyer of incentive plans will generally have either read the Star Award advertisement himself or,

if in the Chicago area, have explained to him the Star Award incentive plan by a Creative House representative prior to purchase. In this context, the purchaser is not likely to confuse the origin of the Star Award. This conclusion is supported by depositions the Academy took of six purchasers of Star Awards, all advertising specialty distributors familiar with the Star Award and Creative House through either the Impact catalog, "cut sheets," or the Ad Specialty, Inc. information service, or a combination thereof. All agreed that they had never seen or heard Creative House speak or write about the Star Award as Oscar-like, that no customer had requested an Oscar or Oscar-like statuette and that they had never promoted it to a customer as being Oscar-like. Additionally, the deposition testimony supported Creative House's assertion that its customers are attracted to the star theme, and use the Star Award mainly in sales incentive programs and sometimes to express gratitude to loyal customers.

Thus, despite the similarity in appearance between the Star Award and the Oscar, an analysis of the six factors, on balance, leads this court to the conclusion that there is not a likelihood of confusion among an appreciable number of purchasers of the Star Award. The Academy has, therefore, not made out a claim for false designation of origin under the Lanham Act.

 The Academy has also claimed trade dress infringement which is another variety of "false designation of origin" violative of section 43(a) of the Lanham Act. *See Ives Laboratories, Inc. v. Darby Drug Co.*, 601 F.2d 631, 641 (2d Cir.1979). This claim also fails because the Academy has failed to prove a likelihood of confusion.

III. Unfair Competition

 The Academy claims that Creative House's conduct constitutes unfair competition actionable under *Cal.Bus. & Prof. Code* sections 17200 *et seq.* and the common law. The Lanham Act and California law of unfair competition "are substantially congruent." *International Order of Job's Daughters*, 633 F.2d at 916; *Ball v.*

**1452**

American Trial Lawyers Ass'n, 14 Cal. App.3d 289, 303, 92 Cal.Rptr. 228, 237 (1971). The primary consideration in trademark-related unfair competition cases in California, as elsewhere, is the likelihood of confusion. See, e.g., American Trial Lawyers Ass'n, 14 Cal.App.3d at 308, 92 Cal. Rptr. at 237 (1971). Because the court has concluded there is not a likelihood of confusion, this claim must fail as well.

IV. Unlawful Dilution

 The Academy has registered a two-dimensional depiction of the Oscar with the United States Patent and Trademark Office. The California anti-dilution statute, Cal.Bus. & Prof.Code section 14330, protects well-recognized marks even in the absence of a likelihood of confusion if defendant's use dilutes the distinctive quality of the mark. 2 J. McCarthy, Trademarks and Unfair Competition, section 24:13 (2d ed. 1984). The rationale of the dilution doctrine is that "the gradual diminution or whittling away of the value of a trademark, resulting from use by another, constitutes an invasion of the senior user's property right and good will in his mark and gives rise to an independent wrong." Id. However, the Academy has not proved that Creative House's use of the Star Award has diluted the quality of the Oscar or invaded the good will the Academy has developed in the Oscar. Although the Academy need not prove actual injury to sustain this claim, it is relevant that the Academy has stipulated that it has suffered no monetary damage and has increased its phenomenal television audience for the several years that Creative House has been selling the Star Award. The court, therefore, concludes that the Academy has not made out a claim for trademark dilution.

V. Attorneys' Fees

The Academy obviously cannot recover attorneys' fees for it has not prevailed on any of its claims. Creative House has requested attorneys' fees for its defense of the trademark infringement claim. The American rule is that attorneys' fees are not ordinarily recoverable as costs for the prevailing party. Transgo Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1025 (9th Cir.1985). In 1975, however, Congress amended section 35 of the Lanham Act to permit the recovery of fees for the prevailing party in "exceptional cases." 15 U.S.C. section 1117. The Ninth Circuit has interpreted the "exceptional case" standard to mean "extraordinary, malicious, wanton, and oppressive conduct." Transgo, Inc., 768 F.2d at 1026. There is no evidence of any such conduct here. Thus, Creative House may not recover any part of its attorneys' fees from the Academy.

The foregoing constitutes the court's findings of fact and conclusions of law as prescribed by Rule 52(a) of the Federal Rules of Civil Procedure.